**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Bernard J. COVEN and James F. O'Connor, Defendants-Appellants.**

Nos. 127–129, Dockets 81–1106, 81–1120, 81–1122.

United States Court of Appeals, Second Circuit.

Argued Sept. 14, 1981.

Decided Oct. 26, 1981.

Milton S. Gould, New York City (Robert Gold, Jonathan C. Thau, Shea & Gould, New York City, of counsel), for appellant Coven.

Irving Anolik, New York City, for appellant O'Connor.

Audrey Strauss, Asst. U. S. Atty., S.D. N.Y., New York City (John S. Martin, Jr., U. S. Atty., Robert N. Shwartz, Asst. U. S. Atty., S.D.N.Y., New York City, of counsel), for appellee.

Before OAKES and MESKILL, Circuit Judges, and BLUMENFELD,* District Judge.

MESKILL, Circuit Judge:

James F. O'Connor and Bernard J. Coven appeal from judgments of the United States District Court for the Southern District of New York, Carter, J., entered after a trial by jury convicting each of one count of conspiracy, 18 U.S.C. § 371 (1976); eight counts of mail fraud, 18 U.S.C. §§ 1341–42 (1976); one count of wire fraud, 18 U.S.C. §§ 1342–43 (1976); and one count of obstruction of justice, 18 U.S.C. § 1503 (Supp. III 1979). In addition, Coven was convicted of one count, and O'Connor of two counts of false declaration, 18 U.S.C. § 1623 (1976 & Supp. III 1979). The district court sentenced both appellants to ten years imprisonment[1] and imposed the maximum com-

---

* Honorable M. Joseph Blumenfeld, United States District Judge for the District of Connecticut, sitting by designation.

1. The sentences were calculated as follows: five years imprisonment on each of the counts of conspiracy, mail fraud and wire fraud, to run concurrently, and five years imprisonment on each of the counts of obstruction of justice and false declaration, to run concurrently with respect to each other but consecutively with respect to the terms imposed on the counts of conspiracy, mail fraud and wire fraud.

mitted fine as to each count, totalling $34,-000 as to Coven and $44,000 as to O'Connor. We affirm.

## BACKGROUND

Coven and O'Connor owned beneficial interests in Euro-Swiss International Corporation ("Euro-Swiss"), a company which sold commodities contracts to retail operations which in turn sold similar contracts to the public. Coven, an attorney, was counsel to Euro-Swiss. The company operated out of Coven's New York law offices.

Euro-Swiss sold "deferred delivery" contracts for various commodities such as gold, silver and currencies. While these contracts gave the purchaser the right to obtain delivery of a particular commodity at a set price on a specified date, delivery was rarely, if ever, demanded. Instead, Euro-Swiss would liquidate the contracts by paying to the purchaser the equity value—the excess of the market price of the commodity over the contract price—on the date set for delivery. Thus, if the market price of the commodity exceeded the contract price on the delivery date, the contract would yield a profit to the purchaser. If the market price on the delivery date was lower than the contract price, the purchaser simply would forgo his option to exercise his rights under the contract and the value paid for the contract would be profit to the seller.

Morgan Harris & Scott, Ltd. ("MHS"), and later, Harrison Prescott, Inc. ("HP") were major customers of Euro-Swiss. These companies, both owned and operated by one Earl Wilt, were so-called "boiler room" operations which used high pressure telephone sales and other tactics to induce the public to purchase contracts for the

deferred delivery of commodities.[2] MHS and HP "covered" these "retail" contracts by purchasing similar "wholesale" contracts from Euro-Swiss.

In early August 1979, the United States Postal Inspectors executed a warrant to search the premises of MHS and HP, seizing the companies' books and records and effectively shutting them down. Later that month, the Commodity Futures Trading Commission ("CFTC") filed a complaint seeking to enjoin MHS and HP from conducting further business and to have a receiver appointed. District Judge Constance B. Motley appointed Steven J. Glusband as receiver on September 28, 1979.

During the period between the execution of the search warrant by the Postal Inspectors and the commencement of suit by the CFTC, Earl Wilt agreed to plead guilty to one count of mail fraud and to various violations of state law, and to cooperate with the government in its investigation of Euro-Swiss.

When MHS and HP were shut down, they had several outstanding contracts with Euro-Swiss. As these contracts matured, Euro-Swiss became obligated to pay substantial sums of money to MHS and HP and, therefore, to the receiver. In an attempt to avoid paying these sums, Coven and O'Connor embarked on a course of action designed to defraud the district court and the receiver by transferring Euro-Swiss funds to out-of-state and personal accounts, executing and backdating a fraudulent customer agreement between Euro-Swiss and the receiver's companies, altering the books and records of Euro-Swiss to reflect fabricated transactions and giving false testimony at an attachment proceeding instituted by the receiver against Euro-Swiss.

---

**2.** On June 1, 1978, Commodity Futures Trading Commission Rule 32.11, 17 C.F.R. § 32.11, went into effect. This rule, promulgated pursuant to 7 U.S.C. § 12a(5) (1976), made it unlawful "for any person to solicit or accept orders for, or to accept money, securities or property in connection with, the purchase or sale of any commodity option, or to supervise any person or persons so engaged." Congress later confirmed this position by codifying Rule 32.11 in the Commodity Futures Trading Act of 1978, § 4c(c), 7 U.S.C. § 6c(c).

The MHS and HP contracts, which purported to be deferred delivery contracts rather than commodity options, were apparently designed to circumvent the prohibition on sales of commodity options. This attempt to disguise the contracts was destined to fail. *See, e. g., CFTC v. U.S. Metals Depository Co.*, 468 F.Supp. 1149 (S.D.N.Y.1979).

The government's evidence included the testimony of several witnesses, tape recordings made by Earl Wilt during visits to Euro-Swiss' offices and during telephone conversations after he had agreed to cooperate with the government, books and records of Euro-Swiss and portions of the transcript of the attachment proceeding before Judge Motley. On these appeals Coven and O'Connor challenge not only the rulings of District Judge Carter at the criminal trial but also the prior conduct of District Judge Motley and the government preceding and during a civil attachment hearing.

## DISCUSSION

### I. *The Recusal Claim*

Before we address the allegations relating to the criminal trial we first examine the earlier proceedings before Judge Motley which appellants claim taint the subsequent criminal trial, thereby requiring reversal.

Appellants strenuously argue that the civil attachment proceeding, out of which some of the criminal charges and some of the evidence presented in the criminal trial grew, was invalid due to Judge Motley's failure to recuse herself under 28 U.S.C. § 455.[3] This invalidity, they contend, tainted the subsequent criminal proceedings before Judge Carter. Appellants claim that Judge Motley obtained "personal knowledge of disputed evidentiary facts" and was therefore required to recuse herself from the attachment proceeding. According to appellants, Judge Motley's "pre-knowledge" of evidence relating to facts disputed in the proceeding created a situation in which her "impartiality might reasonably be questioned." This allegedly disqualifying "pre-knowledge" was obtained when Assistant United States Attorney Audrey Strauss, who subsequently prosecuted the criminal case, approached Judge Motley asking that

Glusband, the receiver, be permitted to cooperate in a criminal investigation of Coven and O'Connor. Strauss told Judge Motley that Earl Wilt, while cooperating with the government, had obtained evidence that Coven and O'Connor had attempted to defraud the receiver by showing him records of fictitious orders from MHS to Euro-Swiss for which MHS had not paid, and by producing a fraudulent, backdated customer agreement between MHS and Euro-Swiss. These documents, if genuine, would have demonstrated that Euro-Swiss did not owe money to MHS under the maturing contracts. Judge Motley permitted Glusband to report to the government on any meetings with Coven and O'Connor in the course of his duties as receiver, but warned that Glusband should inform the court of any conflict that might develop between his duties as receiver and his cooperation with the criminal investigation.

A few weeks later, Glusband filed a complaint against Euro-Swiss and obtained an *ex parte* order attaching Euro-Swiss' assets. Glusband moved to confirm the order, and Euro-Swiss cross-moved for an order vacating the attachment. Judge Motley scheduled the matter for an immediate hearing after which she denied the motion to vacate the attachment. Appellants argue here as they did before Judge Carter that Judge Motley's prior knowledge of evidence received from Strauss relating to attempts to defraud Glusband required the Judge to recuse herself from presiding over this hearing.

Section 455(b)(1) requires recusal when a judge has "personal knowledge of disputed evidentiary facts concerning the proceeding ...." The term "personal" was carried over from 28 U.S.C. § 144 when section 455 was amended in 1974. Pub.L.No.93–512, 88 Stat. 1609. This amendment to section 455 was intended to make the statutory stan-

---

**3.** Section 455 provides, in pertinent part:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts, concerning the proceeding....

dards for judicial disqualification consistent with those set forth in Canon 3C of the ABA Code of Judicial Conduct. *See* H.R. Rep.No.93–1453, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] U.S.Code Cong. & Ad. News 6351. The ABA Code was adopted in 1972 in the light of a long line of cases holding that "personal" as· used in section 144 means "extrajudicial." Knowledge acquired by the judge while he performs judicial duties does not constitute grounds for disqualification. *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966); *United States v. Bernstein*, 533 F.2d 775, 785 (2d Cir.), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976). There is no indication in the ABA Code, the accompanying commentary, or the legislative history of section 455 that this earlier judicial interpretation of "personal" was disapproved. Against this background it is clear that by amending section 455 Congress intended to transfer the extrajudicial bias limitation contained in section 144 to section 455(b)(1). Information or knowledge possessed by a judge must stem from an extrajudicial source to warrant disqualification. *In re International Business Machines Corp.*, 618 F.2d 923, 927–28 (2d Cir. 1980); *United States v. Wolfson*, 558 F.2d 59, 62–63 (2d Cir. 1977).

■ In this case, the information in question was obtained by Judge Motley when the government sought her approval of an agreement by a receiver she had appointed to cooperate in a criminal investigation. It was clearly within her judicial responsibilities to be informed of proposed activities that might impair the receiver's ability to perform his duties properly. Therefore, Judge Motley was not required to recuse herself under 28 U.S.C. § 455(b)(1).

Appellants also claim that recusal was required under 28 U.S.C. § 455(a), asserting that Judge Motley's impartiality in the attachment proceeding "might reasonably be questioned" because of her familiarity with matters in dispute. Section 455(a) does not contain the term "personal" found in section 455(b)(1). Thus, it has been asserted that this section does not contain the requirement that to be disqualifying bias must spring from an extrajudicial source. *See* Note, *Disqualification of Federal Judges for Bias or Prejudice*, 45 U.Chi.L. Rev. 236, 254–57 (1978). As this Court has said in the past,

> We recognize that § 455(a) is designed to negate the "duty to sit" notion and to allow "a greater flexibility in determining whether disqualification is warranted in particular situations." *United States v. Ritter*, 540 F.2d 459, 462 (10th Cir. 1976), *cert. denied*, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976). Also, we do not read the authorities [interpreting "personal" as "extrajudicial"] as holding that a judge's conduct of proceedings before him can never form a basis for finding bias.

*United States v. Wolfson*, 558 F.2d at 63 (footnote omitted).

■ However, under section 455(a) considerations, the fact that Judge Motley came upon the allegedly prejudicial information in her judicial rather than personal capacity, even if not dispositive, is relevant to an analysis of the appearance of impartiality. *See In re International Business Machines Corp.*, 618 F.2d at 929; *United States v. Daley*, 564 F.2d 645, 651–52 (2d Cir. 1977), *cert. denied*, 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978). In *Wolfson*, this Court held that section 455(a) did not require a judge to recuse himself from *coram nobis* proceedings which touched on activities at two trials over which he presided. The Court said:

> We understand that regardless of a court's fairness, a defendant who has undergone two lengthy trials before the same judge, both of which ended in guilty convictions, may come to consider that. judge as biased against him. These suspicions are understandable, but, without more, they do not provide a reasonable basis for questioning a judge's impartiality.

558 F.2d at 64. *See also, In re Corrugated Container Antitrust Litigation*, 614 F.2d 958, 964–65 (5th Cir.), *cert. denied*, 449 U.S.

888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980); *United States v. Schreiber*, 599 F.2d 534, 535–37 (3d Cir.), *cert. denied*, 444 U.S. 843, 100 S.Ct. 86, 62 L.Ed.2d 56 (1979); *United States v. Cowden*, 545 F.2d 257, 265–66 (1st Cir. 1976), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977).

■ In the instant case, appellants claim that Judge Motley's prior knowledge of evidence relevant to the attachment hearing rendered her impartiality reasonably questionable. We disagree. Certainly, her prior knowledge was no more extensive than that of the trial judge in *Wolfson*, and there is no other basis in the record for questioning her ability to be fair and impartial.[4] Judge Motley's actions were wholly proper and in accord with the law.

## II. *Improprieties in the Civil Proceedings*

■ Appellants claim that the government may have used the civil proceedings to "create" incriminating evidence for use at the criminal trial. They note that the government's criminal investigation had begun by the time the early stages of the civil proceedings were underway and that several parties to the civil case were actively cooperating with the government throughout the receivership and attachment proceedings. Appellants assert that they are entitled at least to an evidentiary hearing to determine whether the government manipulated the civil case to create criminal charges and supporting evidence. To buttress this claim, Coven directs our attention

to cases in which perjury indictments have been invalidated on the ground that the perjurious testimony was given before improperly convened grand juries or other incompetent tribunals. *E. g., Brown v. United States*, 245 F.2d 549 (8th Cir. 1957); *United States v. Icardi*, 140 F.Supp. 383 (D.D.C.1956). Coven also cites decisions which held that the government, purporting to be investigating civil matters, used improper investigatory techniques or civil discovery mechanisms to obtain otherwise unavailable evidence for use in criminal prosecutions. *E. g., United States v. Parrott*, 248 F.Supp. 196 (D.D.C.1965); *United States v. Guerrina*, 112 F.Supp. 126 (E.D.Pa.1953). These cases do not support appellants' position.

The civil proceedings conducted by receiver Glusband, as well as the preliminary proceedings conducted prior to his appointment, were begun for the legitimate purpose of recovering money owed to MHS and HP. It is clear that Judge Motley had jurisdiction over this matter. Therefore, the "incompetent tribunal" cases are inapposite. Moreover, we find no evidence that the government used civil discovery mechanisms or otherwise duped appellants into producing incriminating evidence by representing falsely that it was exploring a civil matter. Thus, *Parrott* and *Guerrina* do not help appellants.[5]

The record in this case reveals that a legitimate civil action was brought by the

---

4. In any event, we have grave doubts as to whether a finding that Judge Motley was incorrect in failing to recuse herself in the civil proceeding would provide any basis for relief in this criminal action. Certainly dismissal of the indictment would be inappropriate. *See United States v. Fields*, 592 F.2d 638, 646–48 (2d Cir. 1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979). Because we find that Judge Motley acted properly, we decline to speculate about the possibilities for other forms of relief had we found merit in appellants' recusal argument.

5. Even if *Parrott* and *Guerrina* were apposite, we would hesitate to dismiss the indictment. In *Guerrina*, the Eastern District of Pennsylvania merely suppressed evidence on the basis of Fourth and Fifth Amendment violations. In

*Parrott*, the United States District Court for the District of Columbia dismissed an indictment on the basis of a violation of the Sixth Amendment right to a speedy trial. The court specifically stated that were it not for the speedy trial violation, suppression of evidence would have been the appropriate remedy unless the improperly gathered evidence was a basis for the entire criminal prosecution. 248 F.Supp. at 202.

This Court has stated that dismissal of an indictment is to be used only "in the rare case, where it is impossible to restore a criminal defendant to the position that he would have occupied vis-a-vis the prosecutor ...." *United States v. Fields*, 592 F.2d 638, 648 (2d Cir. 1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979).

receiver against a company controlled by Coven and O'Connor. In an attempt to refute legitimate claims, Coven and O'Connor presented fraudulent documents to the court and testified falsely at an attachment hearing. That the government, aware that Coven and O'Connor might attempt to defraud the civil tribunal, monitored the civil proceeding intending to prosecute any noted criminal violations does not transform the attachment proceeding into a sham conducted merely to create criminal charges.

### III. Confrontation Claims

#### A. The Limitation on Repetitious Cross-Examination

■ O'Connor claims that his right to cross-examine witnesses against him was denied when the trial court refused to allow his lawyer to repeat questions already asked or to explore areas already covered by Coven's cross-examination. Federal Rule of Evidence 611(a) permits the trial court to "exercise reasonable control over the mode and order of interrogating witnesses" in order to "make the interrogation . . . effective for the ascertainment of the truth [and to] avoid needless consumption of time . . . ." While the trial court's discretion to curtail cross-examination is limited by the Sixth Amendment, *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), we do not believe that the limit was reached in this case.

■ The trial court cut short the questioning by O'Connor's lawyer several times, but reminded defense counsel frequently that he would be permitted to expand upon or delve more deeply into areas covered during Coven's cross-examination. O'Connor's lawyer was prevented only from asking the same questions that Coven's lawyer had asked. The trial court's ruling here was reasonable and did not preclude O'Connor from effectively cross-examining witnesses. *See United States v. Praetorius*, 622 F.2d 1054, 1061 (2d Cir. 1979), *cert. denied sub nom. Lebel v. United States*, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980).

#### B. Interview of Agent Livertucci

Judge Carter, in the presence of the prosecutor but not of the defense counsel, questioned IRS Agent Livertucci, who had interviewed Earl Wilt, to determine whether the IRS possessed any material subject to production under the Jencks Act, 18 U.S.C. § 3500 (1976). Appellants claim that this *in camera* interview violated their right to confront witnesses against them.

■ However, Agent Livertucci was never called as a witness against Coven and O'Connor and therefore no Sixth Amendment confrontation rights were implicated. *United States ex rel. Meadows v. New York*, 426 F.2d 1176, 1184 (2d Cir. 1970), *cert. denied*, 401 U.S. 941, 91 S.Ct. 944, 28 L.Ed.2d 222 (1971). Furthermore, an *in camera* interview is expressly authorized by 18 U.S.C. § 3500(c), and neither Coven nor O'Connor objected when the court announced its intention to conduct such an interview. Also, we have examined the materials turned over to the court by Agent Livertucci, and they contain absolutely nothing that the government was required to produce under either the Jencks Act or under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The trial court did not err in its handling of Agent Livertucci.

#### C. Earl Wilt's Attorney-Client Privilege

Appellants also assert that their right of confrontation was denied when Earl Wilt was permitted to invoke the attorney-client privilege when questioned about conversations he had with his lawyers concerning his cooperation agreement with the government. Appellants claim that these questions were relevant to Wilt's state of mind or motivation when signing the agreement and, therefore, to his bias.

■ It is clear that government witnesses have a right to assert the attorney-client privilege on cross-examination. *E. g., United States v. Sindona*, 636 F.2d 792, 804–05 (2d Cir. 1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981). However, where assertion of the privilege

unduly restricts a defendant's cross-examination, the witness' direct testimony may have to be stricken. *See Dunbar v. Harris*, 612 F.2d 690 (2d Cir. 1979) (cross-examination limited by witness' assertion of privilege against self-incrimination); *United States v. Cardillo*, 316 F.2d 606 (2d Cir.), *cert. denied*, 375 U.S. 882, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963) (cross-examination limited by witness' assertion of privilege against self-incrimination). In this case, however, Wilt's state of mind when signing the cooperation agreement was a collateral matter going only to Wilt's general credibility. Therefore Wilt's assertion of the attorney-client privilege did not deprive appellants of their constitutional right to confrontation. *See Dunbar v. Harris*, 612 F.2d at 692–93; *United States v. Cardillo*, 316 F.2d at 611. Moreover, appellants conducted an extensive cross-examination of Wilt which included direct questions about his state of mind when signing the agreement. Wilt's possible bias was readily ascertainable by the jury. Therefore, even if the trial court's ruling were erroneous, the error would have been harmless.

### D. The White Powder

Appellants' final confrontation clause claim is that they were not allowed to explore significantly the origin and content of certain "white powder" found in the offices of MHS and HP. This claim is groundless. Appellants were permitted to investigate the circumstances surrounding the discovery of the powder and the action of the government with respect to it. They were precluded only from asking questions about Wilt's use of drugs—questions for which they showed no reasonable basis.

### IV. *The Government's Summation*

Appellants claim that the government in its summation improperly commented on appellants' failure to call a particular witness, that the prosecutor made other improper comments including the suggestion that the missing witness would have damaged the defendants' case, and that the prosecutor implied to the jury that she had personal knowledge of facts prejudicial to appellants which were not in evidence.

It is well established that the government may comment on the failure of a defendant to refute government evidence or to support his own claims.

A constitutional violation occurs only if either the defendant alone has the information to contradict the government evidence referred to or the jury "naturally and necessarily" would interpret the summation as comment on the failure of the accused to testify.

*United States v. Bubar*, 567 F.2d 192, 199 (2d Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977). *See United States v. Sindona*, 636 F.2d 792, 805–07 (2d Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981); *United States v. Barnes*, 604 F.2d 121, 148 (2d Cir. 1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Rodriguez*, 556 F.2d 638, 641–42 (2d Cir. 1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1233, 55 L.Ed.2d 762 (1978). In the instant case, the prosecutor commented on the failure of appellants to call Harriet Gilmore, a Euro-Swiss employee, to ask if she had altered a Euro-Swiss ledger which the prosecution charged contained entries of fictitious transactions added to the ledger long after the transactions were claimed to have occurred. Appellants called another Euro-Swiss employee, Joan Werring, who testified that she had not altered the ledger, apparently attempting to support the defendants' claim that the challenged entries were genuine. The prosecutor's summation pointed out the absurdity of calling Werring instead of Gilmore to testify about the challenged entries when uncontradicted evidence showed that the entries were in Gilmore's handwriting.[6] This statement clear-

---

6. The comments to which appellants object were as follows:

[Assistant U. S. Attorney Strauss:]

You will notice from the testimony of Joan Werring that the two entries for the Mexican peso orders were not in her handwriting. None of the surrounding entries were in her

ly cannot be construed as a comment on the defendants' failure to testify.

On rebuttal, the prosecutor asserted that "the law does permit me to make" the argument that the jury could infer that appellants' failure to call Harriet Gilmore was due to their fear of damaging information that Gilmore would have supplied, and that if this argument were improper, defense counsel's objection to it "would have been sustained." These assertions were made in response to defense counsel's closing statement which suggested that the prosecutor was acting improperly when she commented on appellants' failure to call Gilmore and that the prosecutor "knows better." [7] The government certainly was entitled to respond to such an accusation. *See United States v. Sindona*, 636 F.2d at 807; *United States v. Praetorius*, 622 F.2d at 1060–61; *United States v. Stassi*, 544 F.2d 579, 585 (2d Cir. 1976), *cert. denied*, 430 U.S. 907, 97 S.Ct. 1176, 51 L.Ed.2d 582 (1977).

■ Finally, appellants claim that the prosecutor implied personal knowledge of facts and was "testifying" during summation. A review of the transcript demonstrates that this claim is wholly unfounded. The only comment that arguably comes even close to being improper is the prosecutor's statement that had the defendants called Harriet Gilmore to testify, her testimony "would have buried" them. However, when viewed in the context of the entire summation, *United States v. Sindona*, 636 F.2d at 806; *United States v. Williams*, 583 F.2d 1194 (2d Cir. 1978), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59

handwriting. Whose handwriting were they in? In the handwriting of Harriet Gilmore. Isn't it interesting, ladies and gentlemen, the defendants call not Harriet Gilmore but Joan Werring?

Mr. Anolik [O'Connor's counsel]: Objection, your Honor.

The Court: Overruled.

Mr. Anolik: We have no obligation to call anyone.

The Court: That objection is overruled.

Ms. Strauss: Mr. Gold [Coven's counsel] asked Joan Werring: Did you alter, did you fabricate, that customer ledger? But Harriet Gilmore is not on the stand and they are not asking that question of her. Why wasn't she called?

 . . . . .

They didn't call Harriet Gilmore and ask those questions because she would have buried them deeper than the evidence against them already is in this case.

7. During his summation, Mr. Anolik, attorney for appellant O'Connor, stated:

Mr. Anolik: . . .

These defendants, our clients, are entitled to a presumption of innocence. His Honor will explain that. But that means, ladies and gentlemen, that they're presumed innocent.

Ms. Strauss indicated that—you heard me object—that a person by the name of Harriet Gilmore was not called. We have no obligation to call or not call anyone because, as his Honor will tell you in the charge—and I am not presuming to charge you on the law, only Judge Carter can do that—but as his Honor will tell you, we don't have to prove or disprove anything.

Our clients are presumed innocent and the entire burden of proof beyond a reasonable doubt is on the government.

Thank God in this country there is a presumption of innocence, not a presumption of guilt.

So why Ms. Strauss who I'm sure knows better than that would say such a thing, I don't know. Perhaps she can tell you when she comes back and addresses you.

On rebuttal, Assistant United States Attorney Strauss responded:

Ms. Strauss: . . .

In a similar vein, Mr. Anolik says: Why did Ms. Strauss comment on the fact that the defendants failed to Harriet Gilmore [sic]?

And I think he said something along the lines: Ms. Strauss knows better than that.

In response to that, ladies and gentlemen, I think I am entitled to tell you that I know that the law does permit me to make such an argument. Mr. Anolik made an objection. It was overruled by Judge Carter—and you know very well if he was right and his objection valid—

Mr. Anolik: Objection, your Honor.

The Court: I think she is entitled to say that. You may proceed.

Ms. Strauss: If his objection had been valid it would have been sustained, and Judge Carter would not have permitted me to make the argument. I was permitted to do so because it was a proper argument and something you should continue to think about. Harriet Gilmore was the one who wrote the Mexican pesos transactions in the customer ledger, but they didn't call her and ask her whether she altered the books and records. They have called someone else who didn't make the entry.

L.Ed.2d 77 (1979), this comment is clearly seen as a suggestion of a permissible inference for the jury to draw rather than a statement of personal knowledge of what Gilmore would have said.

### V. *Jury Instructions*

■ Appellants claim that they were prejudiced by the trial court's jury charge on the conspiracy count which referred several times to "two or more" conspirators when the conspiracy charged involved only Coven and O'Connor. Appellants contend that this charge invited the jury to "speculate about the existence of multiple conspiracies" and left "the basis for the jury's verdict . . . totally unclear . . . ." Brief for Appellant Coven at 45. Appellants concede that the "two or more" language was contained in their own requests to charge, but argue that the requests were prepared long before the close of the trial in reliance on the government's bill of particulars which alleged that there were several other conspirators.

We are unpersuaded by appellants' arguments on this point. The jury charge paralleled the language of the conspiracy statute, 18 U.S.C. § 371. Moreover, the trial judge specifically charged that should the jury find either Coven or O'Connor not guilty of conspiracy, it must acquit both. The reference to two or more conspirators was, at most, harmless error.

### VI. *Fourth Amendment Claim*

Appellants argue that their Fourth Amendment rights were violated when government informant Wilt surreptitiously recorded conversations conducted in his presence but to which he was not a party, and read into the tape recorder the contents of various Euro-Swiss documents. These recordings were made after Wilt signed a cooperation agreement with the government and went to Coven and O'Connor claiming to seek employment. This claim is without merit.

■ Appellants first question the vitality of *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), which permitted the use of tape recordings of conversations between a government agent and the defendant to be used as evidence in the defendant's criminal trial. *White* has not been overruled and we are unquestionably bound by it.[8] However, appellants claim that *White*, even if binding, extends only to conversations to which the government agent was a party, not to statements merely made in his presence nor to documents within his view.

This claim is controlled by *United States v. Girard*, 601 F.2d 69, 72 (2d Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979), which held that the introduction into evidence of a tape recording of conversations conducted in the presence of a government agent did not violate the Fourth Amendment even though the agent was not a party to all of the conversations recorded. The *Girard* panel reasoned that the defendant had no reasonable expectation of privacy that would preclude the government agent, who was in the room with the defendant's permission, from testifying about what he was able to hear. Therefore, the defendant could not complain because the agent recorded his statements. *Girard* forecloses appellants' claim that Wilt's recording of conversations to which he was not a party violates the Fourth Amendment.

---

8. *White* was not, as appellants assert, a plurality decision. As Judge Friendly said in *United States v. Bonnano*, 487 F.2d 654, 657 n.1 (2d Cir. 1973):

[Appellant argues] that *White's* binding effect is limited by its having produced a "4–4 split" on the major issue, with a fifth vote, that of Justice Brennan, having been attracted to the majority only on the narrow ground that *Katz* lacked retroactive effect. This argument misses the point that Justice Brennan was the sixth and not the fifth vote in the *White* majority. Justice Black concurred with the four-man plurality not on a narrow ground like that of Justice Brennan, but rather on the extremely broad one that eavesdropping by electronic means does not constitute a "search" or "seizure" within the meaning of the Fourth Amendment. *White* is therefore authoritative on the constitutional validity of recording and transmitting devices on the person . . . .

■ Given *Girard,* appellants' claim that reading the contents of documents into the tape recorder violated the Fourth Amendment must also fail. Coven and O'Connor had no expectation of privacy protected by the Fourth Amendment with respect to documents that they gave to Wilt or that were within his view when he was in the offices of Euro-Swiss with appellants' permission. Since Wilt could have testified to the contents of the documents without violating appellants' Fourth Amendment rights, he could also read their contents into a tape recorder.

### VII. *Harriet Gilmore's Civil Court Testimony*

■ Appellants claim that the government misled both the trial court and appellants by stating in its bill of particulars that Harriet Gilmore, an employee of Euro-Swiss who allegedly made fraudulent entries in a Euro-Swiss ledger, was an unindicted co-conspirator, but abandoning this claim after trial. Appellants assert that as a result of this claimed ruse, they failed to object to the government's reading into the record of portions of Gilmore's civil court testimony, believing that this testimony was hearsay, but within the co-conspirator exception to the hearsay rule. They claim that if Gilmore was not shown to be a co-conspirator, this testimony was inadmissible.

The short answer to this claim is that the evidence in question is not hearsay because it was not offered for the truth of the matters asserted. *See* Fed.R.Evid. 801(c). The evidence was a portion of the transcript of the attachment hearing during which Coven called Gilmore to provide a foundation for the introduction of the altered Euro-Swiss ledger which he used in an attempt to defeat the order of attachment. Thus, the transcript was read into the record in the criminal trial not for the truth of Gilmore's statements, but as direct evidence of Coven's act of obstruction of justice.

### VIII. *The Conspiracy Count*

■ Appellants argue that the conspiracy count is legally insufficient because it charges a conspiracy to obstruct justice beginning in September 1979, more than a month before the filing of the civil lawsuit that was the target of the obstruction. We find no merit in this claim. The government alleged as objects of the conspiracy not only the obstruction of justice in the civil suit, but also attempts to avoid paying sums owed to MHS and attempts to defraud the receiver. The jury could well have found on this record that the conspiracy began long before the receiver filed suit in November.

Appellants also claim that the trial court erred in refusing to allow them to introduce court papers from a state court suit involving government informant Wilt but not Coven or O'Connor. These papers had been marked Coven's Exhibit S for identification. Appellants assert that this evidence would have cast doubt on government claims that O'Connor and Wilt, in referring to a "receiver" in a recorded conversation on September 5, 1979, were referring to a receiver that they anticipated would be appointed for MHS and HP. Coven and O'Connor contend that the court papers in Exhibit S would have shown that Wilt and O'Connor may have been referring to a receiver in Wilt's other lawsuit. Since the government used the September 5 tape as evidence that the Coven-O'Connor conspiracy began by early September, appellants claim that Exhibit S was highly relevant for the purpose of defeating the conspiracy count.

■ After examining Exhibit S, we feel that its usefulness for the purpose now asserted by appellants is doubtful. Furthermore, this purpose was asserted for the first time on appeal. The questioning leading to the offer of the papers strongly suggested that appellants' purpose in using the exhibit was to imply that allegations in the papers prejudicial to Wilt were true or to show that Wilt had acted improperly in the other lawsuit. Appellants do not now claim that Exhibit S was properly admissible on these grounds. Given appellants' failure to alert the trial judge to the purpose they now assert for their offer and the doubtful weight of the evidence even for

this purpose, we decline to upset the trial court's ruling. *See United States v. King,* 560 F.2d 122, 128 (2d Cir.), *cert. denied,* 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977); *United States v. Dioguardi,* 428 F.2d 1033, 1038 (2d Cir.), *cert. denied,* 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54 (1970).

## IX. *Juror Number 7*

Appellants claim that the trial court abused its discretion by refusing to *voir dire* juror number 7, who had advised the judge that he had been a juror two years earlier in a state court case which was "almost identical" to this one in that evidence had been collected surreptitiously. The trial court immediately informed all counsel that the colloquy had taken place and stated his opinion that the matter need not be pursued. Defense counsel neither objected nor requested a *voir dire.* Eleven days later, appellants expressed concern about the juror's statements and asked the court to *voir dire* the juror or to excuse him. Appellants explained their delay in complaining by asserting that they had not previously had a chance to examine the transcript of the court's conversation with the juror. After considering appellants' request overnight, the judge denied it, stating that juror number 7 had been attentive throughout the trial and had not appeared to form premature conclusions on the merits of the case. Appellants claim that this ruling denied them a fair and impartial jury.

 This Court accords broad discretion to the trial judge to assess allegations of juror bias or misconduct, believing that "the trial judge observing the jury on a day to day basis . . . is in the best position to sense the atmosphere of the courtroom as no appellate court can on a printed record." *United States v. Barnes,* 604 F.2d 121, 144 (2d Cir. 1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). *See also United States v. Panebianco,* 543 F.2d 447, 457 (2d Cir. 1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977); *United States v. Flynn,* 216 F.2d 354, 372 (2d Cir. 1954), *cert. denied,* 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955). In *Barnes,* this Court approved the trial court's refusal to dismiss or to conduct a *voir dire* of a juror who had made an obscene gesture toward defense counsel outside the courtroom. Such juror activity plainly is significantly more indicative of possible bias or prejudice than that of juror number 7 in this case. On this record, we cannot conclude that Judge Carter abused his discretion.

## X. *The Wire and Mail Fraud Counts*

[22] Coven claims that:

The government did not introduce any evidence at trial linking Coven to the act alleged in count ten—the transfer of funds [by wire] into the personal account of O'Connor. The government did not demonstrate that Coven promoted, participated in, or had any stake in this transfer, nor did it demonstrate that Coven even had knowledge of this patently personal transaction by O'Connor.

Appellant Coven's Brief at 49. Accordingly, he asserts, the wire fraud count should be dismissed as to him.

Coven's conclusion is incorrect.

To prove a violation of 18 U.S.C. § 1341, the Government need only show that a defendant was one of the participants in a scheme to defraud, and that the mails were used in furtherance of that scheme. *See, e. g., United States v. Cyphers,* 556 F.2d 630, 632 (2d Cir. 1977); *United States v. Finkelstein,* 526 F.2d 517, 526–27 (2d Cir. 1975), *cert. denied sub nom. Scardino v. United States,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). Similarly, to prove a violation of 18 U.S.C. § 1343, it need only be shown that a defendant was one of the participants in a fraudulent scheme which was furthered by the use of interstate transmission facilities. *United States v. Houlihan,* 332 F.2d 8, 13 (2d Cir.), *cert. denied,* 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964). *United States v. Corey,* 566 F.2d 429, 430–31 n.2 (2d Cir. 1977). There was ample evidence in the record to support a finding that Coven was a participant in the overall scheme to defraud MHS, HP, receiver Glus-

band and the district court, and that the wire transfer of Euro-Swiss funds to O'Connor's personal account was in furtherance of that scheme. Coven was properly convicted of wire fraud.

In addition to Coven's specific claim that there was insufficient evidence to link him to the wire fraud, appellants contend generally that there was no evidence that the mailings and the wiring charged by the government were done other than in the usual course of business. Appellants assert, therefore, that there was insufficient evidence to prove that the mailings and the wiring were in furtherance of a scheme to defraud.

The evidence viewed, as it must be, in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), renders this claim ridiculous. There was abundant evidence that the mailings were used to open out-of-state bank accounts in the names of "dummy" corporations and to transfer Euro-Swiss assets into these and other accounts outside New York in an attempt to conceal monies from MHS, HP and the receiver, and to place them beyond the reach of New York State attachment. There was evidence establishing that the wire transfer was undertaken to remove some of the assets in one of the out-of-state accounts to O'Connor's personal account at Bache Halsey Stuart Shields, Inc. The mailings and wiring in this case were clearly central, not incidental, to the scheme to defraud. *See, e. g., United States v. Braunig*, 553 F.2d 777, 781–82 (2d Cir.), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 277 (1977).

### XI. *O'Connor's Effective Assistance of Counsel Claim*

O'Connor claims that he was denied effective assistance of counsel at the attachment proceeding because Judge Motley failed to inform him that his lawyer, Coven, was under criminal investigation at the time the attachment hearing was held. This claim is frivolous. Even if the Sixth Amendment right to counsel applied to civil cases, which it does not, e. g., *Watson v. Moss*, 619 F.2d 775, 776 (8th Cir. 1980), it is clear that O'Connor knew of and participated in Coven's criminal activities both prior to and during the attachment hearing. Under these circumstances, this claim merits no further discussion.

### XII. *Sentencing*

Appellants' final point charges that the trial court abused its discretion in sentencing by relying on an inaccurate and prejudicial sentencing memorandum filed by the government and by pronouncing a "Draconian" sentence, so harsh as to shock the conscience, on young, first-offender O'Connor.

Before passing sentence in this case, the trial judge allowed Coven and O'Connor, both personally and through counsel, to state objections to specific points in the government's memorandum and to offer whatever other statements they wished the court to consider in sentencing. Appellants did not request additional time to prepare a more formal response to the government's memorandum. Moreover, Judge Carter specifically stated that his sentence would be based on the crimes of which appellants had been convicted and on his observance of appellants' demeanor throughout the trial, and not on any contested matters in the government's memorandum.

An appellate court's power to review a sentence within the statutory range is extremely limited. *E. g., Dorszynski v. United States*, 418 U.S. 424, 440–41, 94 S.Ct. 3042, 3051–52, 41 L.Ed.2d 855 (1974); *United States v. Swarovski*, 592 F.2d 131, 133–34 (2d Cir. 1979). In this case, we cannot say that the trial court abused its discretion to a degree that would permit this Court to interfere. Indeed, the sentences imposed in this case appear reasonable in light of the serious nature of the offenses involved.

We find no error in the judgments below. Affirmed.