**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Mitchell M. CALHOUN, Defendant-Appellant.**

No. 74–1259.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 13, 1974.

Decided Jan. 24, 1975.

Certiorari Denied April 28, 1975.

See 95 S.Ct. 1683.

862

Donald S. Eisenberg, Madison, Wis., for defendant-appellant.

Andrew B. Baker, Jr., Asst. U. S. Atty., Hammond, Ind., John R. Wilks, U. S. Atty., Fort Wayne, Ind., for plaintiff-appellee.

Before PELL, SPRECHER and BARNES,* Circuit Judges.

BARNES, Senior Circuit Judge.

This is an appeal from four judgments arising from four convictions by a jury on a six-count indictment. Counts I and II charged possession, with intent to distribute, of two different amounts of heroin, at two places at two times of day on January 18, 1973; Count III charged possession on the same date of marijuana with intent to distribute the same; Count IV charged defendant (a convicted

*Senior Circuit Judge Stanley N. Barnes of the Ninth Circuit, sitting by designation.

felon) with giving a false statement on December 24, 1972 with respect to his previous conviction of a felony, in connection with the acquisition by him of two guns from Jack's Gun Shop, at Chesterton, Indiana; Count V charging the possession on January 18, 1973 by him as a previously convicted felon in Gary, Indiana, of a 30 caliber M-1 Carbine; and Count VI, charging the similar possession by defendant on January 18, 1973 of a Colt .223 caliber revolver. The two guns possessed with respect to Counts V and VI were acquired, as described in Count IV.

Appellant was found guilty on Counts I, IV, V and VI. The trial judge dismissed Count II at the end of the government's case, and the jury found defendant not guilty on Count III.

Appellant was sentenced to eight years on Count I, followed by special parole for 3 years; to 1 year on Counts V and VI, to be served consecutively to each other and to Count I. On Count IV, sentence was suspended and appellant placed on probation for five years, following the three sentences first mentioned.

Appellant urges reversal based on eight alleged errors. We will consider them in turn, defining the issues a little differently than either appellant or appellee.

I. Was defendant denied a speedy trial or "fundamental fairness" by the government?

II. Should defendant's motion to suppress evidence have been granted?

III. Was the court in error in its *voir dire* examination of the jury?

IV. Did the court abuse its discretion in refusing to permit two witnesses offered by defendant to testify; after the witnesses had violated the court's order excluding witnesses during the trial?

V. Should Counts V and VI of the indictment have been consolidated into one charge?

VI. Should Counts IV, V and VI have been dismissed for lack of a nexus with interstate commerce?

VII. Did the government deny proper discovery to defendant?

VIII. Did the trial court err when the bailiff, at the request of the judge, told the jury to continue their deliberations?

I. *Right to a Speedy Trial.*

Alleged errors I and II, *supra,* were raised in the court below by appellant's two motions to dismiss, one filed December 10, 1973, and the second filed January 15, 1974.

The first or "unfairness" charge against the government was the claim that defendant had been granted immunity from prosecution in return for his cooperation with the government. The court had an extensive evidentiary hearing on this claim, and concluded that the evidence produced by plaintiff "is insufficient to mandate the dismissal of the indictment" (C.T.—Order of January 25, 1974). It was characterized as "not the formal immunity that may be granted to a person in order to induce them to testify," but an alleged "informal immunity . . . of a post-arrest promise not to prosecute the person arrested for the offense for which he was arrested."

Defendant had been arrested in 1972, and after that arrest, but prior to his 1973 arrest, he had traveled to Chicago with two government agents, and made some small identification of buildings that were somehow involved with the narcotic traffic.

Defendant stated he had been promised after the 1973 arrest by Agent Thompson of the Drugs Abuse Law Enforcement Agency [herein DALE] and Special United States Attorney Marinaccio, that he would not "get a case," apparently meaning that no case would be filed against him. Each of said persons flatly denied any such agreement.

Under oath, before the Grand Jury, appellant twice denied Marinaccio had made him any promises. This testimony

was quoted in the order of the trial judge. It occurred after the alleged promises had allegedly been made. The trial judge held these statements "strongly support the government's contention that there were no promises not to prosecute." We agree.

■ The second motion to dismiss was based upon an alleged denial of a speedy trial, due to pre-indictment delay of some nine months (from January 18, 1973 to October 12, 1973). The court tested the delay under the "balancing test" set out by the Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) and this Circuit's opinion in United States v. Macino, 486 F.2d 750 (7th Cir. 1973) with their four factors: length of delay, reason for delay, the defendant's assertion of his right to a speedy trial, and prejudice to defendant, if any, due to delay. There was here no prejudicial pre-trial incarceration, defendant being out on bond most of the time before indictment, and up to trial. No prejudice to defendant was claimed or proved.

■ We agree that the trial court's action holding nine months delay was neither unreasonable, nor the denial of a speedy trial, in view of: the failure of appellant to assert his right during that time;[1] the lack of proof of any preju-

dice; the lack of any "oppressive pre-trial incarceration"; and because the defendant's "anxiety and concern", if any, was insufficient to cause him to complain. Further, there was no proof any witness was lost to defendant, or that any witness sought might testify favorably to him.[2]

■ The Federal Rules of Criminal Procedure (48(b)) provide the trial judge "*may*" dismiss for unnecessary delay. Clearly, this remains a matter of discretion with him. No abuse of that discretion appears in this case, as demonstrated by the evidence above stated.

II. *Motion to Suppress Evidence.*

The evidence sought to be suppressed was the narcotics, together with the pink gelatin capsules holding the narcotics and the Dormin dilutant, found in the disabled blue garbage truck, which appellant visited some six to ten times on the 18th of January, 1973.

Appellant asserts that the search was made without warrant, not incident to a lawful arrest, and unreasonable.

The government's position is that there was probable cause to arrest appellant, and to search the truck. We quote in the margin from its Brief the evidence which the government had at the time of appellant's arrest.[3]

1. "We emphasize that failure to assert the right will make it difficult for defendant to prove that he was denied a speedy trial." Barker v. Wingo, 407 U.S. at 532, 92 S.Ct. at 2193 (1972).

2. The Government Brief assures us that "appellant admitted on the stand that no witnesses or evidence was lost to him by virtue of the delay between arrest and indictment." (Gov. Brief, p. 16). A transcript reference in the Government Brief at that point would have been appropriate and appreciated.
   Counsel for defendant did admit he made no objection to the delay between indictment and trial. (Rep.Tr. p. 347).

3. "On January 16, 1973, one Tarbert, a heroin addict previously arrested by Agents of the Drug Enforcement Administration, told Special Agent Kenneth Labik of the Drug Enforcement Administration that the Defendant-Appellant had picked Tarbert up at the Magistrate's office early in the week

and had taken him to Defendant-Appellant's house where he received heroin from him. (HTR. 396–397) Tarbert further advised Agent Labik that the Defendant-Appellant was dealing heroin out of a blue truck parked alongside his father's liquor store at 16th and Broadway. (HTR. 396) The link between Tarbert and the Defendant-Appellant had already been indicated to the Agents by the fact that the Defendant-Appellant was on the scene at the time of Tarbert's arrest on January 12, 1973 and fled the scene at high speed. (HTR. 396–399) Two days after the conversation with Tarbert [1–18–73], the Agents put the liquor store at 16th and Broadway under surveillance. (HTR. 399–400) On ten occasions within the space of three and one half hours, the Agents observed the Defendant-Appellant Mitchell Calhoun leave the liquor store, walk over to and enter the blue truck parked alongside the liquor store and in a few moments return to the liquor

■ Here, then, the agent had the tip of a reliable informer that appellant was dealing in narcotics out of the blue truck. Defendant was associating with known addicts. His visits to the truck were observed, and the holding of Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) comes into play. The arrival of Whittler, the heavy narcotics user, and his actions there, in conjunction with appellant's actions, corroborated all that had been seen. Probable cause was present.

The court below concluded "that the exigent circumstances which have been outlined were of such a nature as to allow a warrantless search of the van . . ." (TTR. at 2). We agree. Among the circumstances present was the likelihood that defendant's "customers" or friends might remove the incriminating evidence. There was ample evidence from which the trial judge could conclude that there was a real danger that this might happen considering that the truck was unlocked, accessible to any passer-by, parked outside his father's store, and in that having sold narcotics out of it for some time his "customers" knew of its locality and the probability

that narcotics were hidden there. *See* United States v. Conner, 478 F.2d 1320 (7th Cir. 1973).

■ We also note that it may be that the district court's holding could also be upheld on the basis the truck was "abandoned."

The truck was later towed away as an abandoned truck. It had one, not two license plates on it, and that license plate which it had was for a previous year. It was full of garbage. It had a flat tire. Its doors were open and unlocked. It had not been moved for some time, as snow was shoveled up around it. Defendant never claimed any interest in the truck. An offer of proof was made by counsel for defendant "that the truck was an abandoned truck and had been in the area for a long time prior to [defendant's] arrest, and had been put there by persons other than the defendant." (TTR. 376). Defendant never alleged a possessory interest in the truck or in the contents of the truck. He therefore may lack standing to object to the search of the truck. *Cf.* Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973).[4]

---

store. (HTR. 400–405). On one occasion, the Agents followed Calhoun from the liquor store in an automobile to 604 Carolina Street where he entered the house and returned to the car. Defendant-Appellant was then followed back to the intersection of 16th and Broadway where before entering the liquor store, he returned to the blue truck. (HTR. 404).

Finally Sylvester Whittler, a person known to Agent Labik to be a heavy narcotics user, entered the liquor store. (HTR. 406–407). The Defendant-Appellant Mitchell Calhoun exited the liquor store with Sylvester Whittler trailing behind. Defendant-Appellant entered the blue truck and was arrested as he returned toward Sylvester Whittler. (HTR. 407–408)" (Appellee's Brief at 17–18).

4. The Supreme Court in *Brown, supra*, at 229, 93 S.Ct. at 1569, states that "there is no standing to contest a search and seizure where . . . defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that in-

cludes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure." In the instant case, defendant failed to make an allegation in accordance with (b), and does not fall under (a) since defendant was not in the truck at the time of the arrest or search.

The Fourth Amendment protects the security of one's person and effects, but unless one claims an interest in the property searched or seized, his standing to object is limited to those searches and seizures which infringe upon his person. While the Fourth Amendment's protection of personal security extends to a certain area around a person, this area moves with the person and changes with the environment in which a person finds himself. Thus if X's friend's home is searched while X is a guest therein, X too may have standing to object to the search. However, once X quits the premises the security of X's person is not offended by a search of his friend's home made in X's absence. Returning to the instant case, defendant has produced evidence to the effect that the vehicle was abandoned. We conclude defendant is no more granted standing under (a) or (b) of *Brown* than

The motion to suppress was properly denied.

### III. *Voir Dire of Jury.*

■ The trial judge asked the jury on *voir dire*, in effect—would you be apprehensive for your own safety in the event the evidence caused you to conclude beyond a reasonable doubt that the defendant was guilty?

Counsel for the defendant, outside the presence of the jury, promptly moved for a mistrial, on the ground that the question inferred that the defendant was that type of an individual who might cause some harm to the jurors (TR. p. 25, line 21). Immediately thereafter (TR. p. 26, line 5), counsel for defendant asked, *in the alternative*, that the court instruct the jury that "this is a standard question, and not directed at this particular defendant." The trial judge stated to counsel it was a "standard question."

The court then advised the jury the question he had asked was a routine question—one asked in all criminal trials in this court, and that it was not to be construed by the jury as indicating any suggestion on his part with regard as to their safety, nor that it had any particular applicability to this case, or with regard to this particular defendant. (TR. p. 27).

While this correction of the original instruction asked did not follow precisely the alternative suggestion made by defendant's counsel, it did so in substance. It apparently satisfied counsel for defendant, for no objection was made to the corrective instruction given.

We cannot agree with counsel for appellant that the foregoing "poisoned the minds of the jury against the defendant" (O.Br. p. 32).

While we think the question might better have been left unasked, in the form that was used, we conclude there was no prejudicial error, under all the circumstances of the case. We conclude this (a) because of the care and patience exercised by the trial judge throughout the trial to remain impartial and scrupulously avoided any indication of partiality; (b) the jury was instructed any inferred reference to the defendant was not intended by the court; (c) insofar as the record discloses, this type of question was a standard instruction in the district court of the Northern District of Indiana in all cases of this type; (d) the court emphasized that the question was not asked to indicate in any way what the court thought about the matter.

### IV. *The exclusion of the testimony of two defense witnesses.*

On the day the trial of this case started (January 19, 1974), counsel for appellant moved for the separation of witnesses for the trial. This was granted, and the court emphasized the fact that "that applies to the defense witnesses as well as the government's witnesses." To this, counsel for appellant answered, "Certainly." (HTR. 440).

The government's case was tried on the afternoon of February 19, and the morning of February 20, 1974. At the afternoon session, counsel for the government requested permission outside

---

would a person who objected to the search of a train after he had disembarked.

Defendant's right to exert standing under (c) of *Brown* is uncertain. In *Brown, supra* at 228, 93 S.Ct. at 1569, the Court said:

"But it is not necessary for us now to determine whether our decision in *Simmons* [Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247], *supra*, makes *Jones* [Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697], 'automatic' standing unnecessary. We reserve that question for a case where possession at the time of the contested search and seizure is 'an essential element of the offense . . . charged.' *Simmons,* 390 U.S., at 390, 88 S.Ct., at 974. Here, unlike *Jones,*

the Government's case against petitioners does not depend on petitioners' possession of the seized evidence at the time of the contested search and seizures."

In the instant case we face the question identified, and avoided, in *Brown.* Defendant here was charged with the possession of narcotics found in the truck, and possession was the essential element, because the only offense charged. Due to the fact that we have held that even if standing is present, the search was still justified by exigent circumstances we will not attempt to anticipate how the Supreme Court will resolve this issue avoided in *Brown.* *But Cf.* United States v. Boston, 510 F.2d 35 (9th Cir. 1974).

the hearing of the jury, to reopen his case. Counsel for defendant objected. The court sustained the objection, but warned Mr. Chudom (counsel for defendant), that he was raising technical questions.[5]

Immediately thereafter, the jury was brought in, and defense counsel started his defense by calling as a witness the defendant's father, Charles Calhoun. Government counsel immediately raised the question of the proposed witness' admitted presence in the court room during both days of the trial, listening to the testimony. The court indicated he would sustain the government's objection. Counsel for defendant then made an offer of proof, first, as to the father's observations on the day of defendant's arrest while defendant was under surveillance; and second, as to certain physical measurements the father had made at the scene of the surveillance after the first trial day. The court then did sustain the government's objection.

Counsel for defendant then called one Theresa Moore to the stand, and the government objected that she too had

been in court both that day and the day before, listening to the prosecution testimony. This fact was not disputed. The court sustained the government's objections and then instructed the jury what he had done, and why (TTR. p. 382).[6]

Appellant's counsel's only excuse for his failure to follow the court's order that he had requested is that a defense lawyer has great pressure on him when trying a criminal case. He asks of this court the rhetorical question, "How can a lawyer, successfully doing his job, be expected to police a courtroom for witnesses that may from time to time 'pop in'?"

The best answer might be that the lawyer was not "successfully doing his job" when he asked for the separation of witnesses ruling, and then failed in any way to police the courtroom. The defendant's father could hardly go unnoticed in the courtroom. The father was there throughout the government's case, and didn't "pop in" and out. Never once in the record did counsel state he had no knowledge Mr. Calhoun, the father, was

---

5.   "THE COURT: All right. I'm not going to let you do it. But you know what may be coming. If I'm going to lay the line on the Government strictly, Mr. Chudom, on witnesses and on the rules as far as witnesses are concerned, you may expect the same thing. Now, if you want to be hard and strict and technical with the Government, I know what may come up here, and they may have some objections. And I'll apply the same standard to you that I applied to them.

"MR. CHUDOM: Well, your Honor, may I state for the record that I would object to the Court indicating to Counsel that my failure to go along with the request to reopen may affect the Court's judgment in regard to other things that may come forth from that witness stand or attempt to be done in defense of the defendant. The interest of the defendant is primarily at stake here, and not whether or not Counsel has been lenient or unlenient or strict or not strict.

"I have been lenient on a lot of things. And I think the Court should have some concern with the fact that they've had testimony from this stand and that Agent Blackman has been there on numerous occasions, in that store; and all of a sudden,

things are popping up after her testimony. Now, I just—I have to object to the indication of the Court that the rulings would be adverse to me in regard to some things we mention if I take the position now that I can't let him re-open. I have to defend my client's rights.

"If the Court wishes to subsequently look askance as to my prerogatives and the rights of my client and the right to protect this defendant, I guess I'll have to restrict that.

"THE COURT: My only statement was the Court is going to give an even application of the rules. And if I deny the Government—exercise my discretion to deny the Government the right to open their case, then I may exercise my discretion in a similar fashion in other instances.

"MR. CHUDOM: If you do in regard to re-opening cases, I would assume that might be binding to me." R.T. 367–68.

6.   The court added a cautionary note:

"You are to draw no inference one way or the other as to their testimony. And you are not permitted to speculate in any way. You are to draw no inference against the defendant because of this ruling of the Court."

present.[7] Certainly his client knew the two witnesses were present, as the court stated: "I . . . observed the defendant nodding and in some form communicating with them [these two people] during the trial." (TTR. 304). *See* United States. v. Schaefer, 299 F.2d 625, 635 (7th Cir. 1962) (Hastings, C. J., dissenting).

We agree with appellee that the sole question is whether the trial court abused its discretion in so ruling. We are satisfied it did not. We come to that conclusion because we are convinced there is a preponderance of the evidence that (a) trial counsel knew of the witnesses' presence in the courtroom during each of the two days; (b) that defense counsel was at fault in not respecting the ruling he had asked the court to make; (c) that there was no way for government's counsel to know whom defendant might call as witnesses; (d) that there could be no prejudice as to the rejection of Charles Calhoun's testimony as to street intersection measurements obtained during the trial, to which any witness could have testified; (e) that a witness (Bernadine Moore) testified as to defendant's actions on the morning of his arrest January 18, 1973, that she was in the liquor store "all day" (or from 12:00 noon on) but only saw the defendant come in once, about 2:00 p. m., and leave in three minutes (or 15 or 20 minutes). Apparently the testimony of both the rejected witnesses would have been cumulative to Miss Moore's testimony.

We are satisfied no abuse of the court's discretion occurred.

### V. *Consolidation of Counts V and VI.*

We are satisfied the law in this circuit, and the prevailing law of a majority of the circuits is, as expressed in this circuit's case of McFarland v. Pickett, 469 F.2d 1277 (7th Cir. 1972), that absent a showing that two firearms were stored or acquired at different times or places, there is only one offense, not two:

"In this case there is no evidence to show whether the two firearms were stored at the same or different locations or whether they were acquired at the same or different times." (Id. at 1279).

Here, there is evidence the two guns were obtained at the same time.

This case therefore must be and is remanded to the district court with directions to dismiss either Count V or VI, and to resentence the defendant on the remaining count.

### VI. *The sufficiency of the nexus with interstate commerce.*

Count IV charges a violation of 18 U.S.C. § 922(a)(6). As to this section, it seems clear Congress intended to exercise all its power in connection with sales of firearms to ex-felons.

In United States v. Nelson, 458 F.2d 556 (5th Cir. 1972), the court said:

"It seems clear from the language of 922(a)(6), from its legislative history, and from the declaration of Congressional purpose that Congress meant to regulate all sales of the types of firearms covered by the Omnibus Crime Act, not just those sales in which the Government can prove some specific connection with interstate commerce. The only question remaining is whether Congress had the power to act as it did."

The court went on:

"We entertain no doubt that it [Congress] has the power to regulate their acquisition without requiring proof of a nexus with interstate commerce in each individual case." (Id. at 559).

Counts V and VI each charge a violation of 18 U.S.C. Appendix § 1202(a)(1).

As to this section, this circuit follows the majority rule that the required nexus with interstate commerce is

---

7. Defense counsel's principal legal argument at trial was that only he had asked for sequestration of witnesses, and the government had not made any motion; and for his witnesses to be bound, the government must make the same motion he did. No cases were cited supporting this unique proposition.

satisfied by proof the received firearm was previously transported in interstate commerce. That proof exists here. United States v. Walker, 489 F.2d 1353 (7th Cir. 1973), cert. denied 415 U.S. 982, 94 S.Ct. 1574, 39 L.Ed.2d 879 (1974); United States v. Brown, 472 F.2d 1181 (6th Cir. 1973); United States v. Giannoni, 472 F.2d 136 (9th Cir.), cert. denied 411 U.S. 935, 93 S.Ct. 1911, 36 L.Ed.2d 396 (1973); United States v. Mancino, 474 F.2d 1240 (8th Cir.), cert. denied 412 U.S. 953, 93 S.Ct. 3020, 37 L.Ed.2d 1007 (1973); United States v. Mullins, 476 F.2d 664 (4th Cir.), cert. denied 414 U.S. 839, 94 S.Ct. 91, 38 L.Ed.2d 75 (1973).

### VII. *Discovery.*

We find no error on the record before us. The government furnished copies of what documents it had (Ex. 8). They had no copies of Exs. 10 and 12 until produced by a witness at the trial.

Such a matter of trial procedure as this is peculiarly appropriate to be left to the judgment of the trial judge, to be interfered with by the appellate courts only when an abuse of discretion clearly appears. We find no such abuse. Appellee's assertions that there was no prejudice to appellant strengthens our position that no abuse of the trial court's discretion appears in the record. Further, appellant urges that if he had had such exhibits as 10 and 12 prior to trial, "he might well have succeeded" in a pretrial motion to consolidate Counts V and VI.

He has succeeded in that endeavor, by reason of our ruling on point V, *supra.*

### VIII. *The Court's instructions to the jury, through the United States Marshal, to continue their deliberations.*

This complained of error has no substance. A careful reading of the transcript of evidence (TTR. 489—494) reveals that neither side suggested or asked for the procedures now asserted by appellant's counsel to have been re-

quired. The issue was not raised below, and has been waived.

We affirm the convictions on Counts I and IV, and either the conviction on Count V or on VI. We remand for the trial court to combine Counts V and VI into one Count, with resentencing on the combined Count, or to dismiss one, and resentence on the other.