**UNITED STATES of America, Appellee,**

v.

**Michael A. PELUSIO, Thomas A. Pelusio, Defendants-Appellants.**

**Nos. 422, 346, Dockets 83–1175, 83–1179.**

United States Court of Appeals, Second Circuit.

Argued Oct. 31, 1983.

Decided Dec. 22, 1983.

Frank E. Blando, Utica, N.Y., for defendant-appellant Michael A. Pelusio.

Stephen M. Brent, Rochester, N.Y., for defendant-appellant Thomas A. Pelusio.

Martin J. Littlefield, Jr., Asst. U.S. Atty., Rochester, N.Y. (Salvatore R. Martoche, U.S. Atty., W.D.N.Y., Rochester, N.Y., of counsel), for appellee.

Before MANSFIELD, CARDAMONE and WINTER, Circuit Judges.

MANSFIELD, Circuit Judge:

Michael A. Pelusio (Michael) and Thomas A. Pelusio (Thomas) appeal from a judgment of the Western District of New York, entered after a jury trial before Judge Michael A. Telesca, convicting them of unlawful receipt of firearms and ammunition transported in interstate commerce, 18 U.S.C. §§ 922(h)(1), 924(a) and 2. Michael was convicted of one count charging receipt of a gun (Count I) and another charging receipt of ammunition (Count IV), while under felony indictment and while having previously been convicted of a felony. Thomas was likewise convicted on two counts (II and V), charging unlawful receipt of the gun and ammunition while under indictment for a felony. We affirm their convictions of unlawful receipt of the gun (Counts I and II), and reverse their convictions of unlawful receipt of the ammunition (Counts IV and V).

The case arises out of hostilities between an insurgent Rochester gang and the gang "in power" in that city. At approximately noon on August 27, 1982, Gerald Pelusio, a brother of the two defendants, was shot to death at the Rochester home of Paul Comfort, a friend of the Pelusios. At 7:00 P.M. on the same day, apparently in retaliation, the front window of a gambling establishment operated by the gang in power was destroyed by a shotgun blast from a pickup truck identified by color and license plate number as probably owned and operated by the Pelusios. After locating the truck outside of Thomas' Rochester home the Rochester police stationed an unmarked car on the street for purposes of open surveillance and were shortly joined by two more police cars, one marked and the other unmarked. The police were aware that Michael was a convicted felon and that the Pelusios often

used and exercised control over a 1976 white and beige Buick bearing New York license plate "18 MFS," owned by Elaine Comfort, wife of Paul Comfort.

While the police were conducting their surveillance Officer Bellucco, who was in the marked police car, noticed a Buick answering this description turn onto the street where the police were parked, following which the Buick pulled over to the side of the street, shut off its lights and started to back away from the police cars. The officers immediately went into action. Two drove their cars to block the front of the Buick, while Officer Bellucco backed his police car past the retreating Buick and cut it off from the rear. As Bellucco exited from his car and approached the Buick, he noticed that the driver was Raymond Sampson, a convicted felon who was a member of the insurgent gang and a friend of the Pelusios and Comfort, and that the two passengers were Thomas (in the front seat) and Michael (on the right rear passenger seat). He heard noises from the inside of the Buick similar to those of shells being ejected from a gun and saw Michael make some "quick motion." Officer Cowley said, "There may be a gun in the car." Officer Bellucco drew his gun, but held it by his side. As he came abreast of the left rear window he noted a Mossberg Pump .12-gauge shotgun in Michael's lap. After the passengers exited the vehicle, Bellucco seized the shotgun, which had a pistol-type grip; a further search of the rear of the car yielded five rounds of .12-gauge shotgun shells.

On October 13, 1982, a six-count indictment was filed against Michael A. Pelusio, Thomas A. Pelusio and Raymond Sampson, charging each in two counts with unlawful receipt of a firearm and unlawful receipt of ammunition in violation of 18 U.S.C. §§ 922(h)(1), 924(a) and 2.[1] Sampson's case

---

1. Title 18 U.S.C. § 922(h)(1) provides:

"(h) It shall be unlawful for any person—
   (1) who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

Title 18 U.S.C. § 924(a) provides:

"(a) Whoever violates any provision of this chapter or knowingly makes any false state-

was severed by the district court prior to trial. Motions by Michael and Thomas to suppress evidence of the seizure of the firearm and ammunition as violative of their Fourth Amendment rights were denied by Judge Telesca after an extended evidentiary hearing.

At trial the evidence not only established the foregoing but also showed that the shotgun found by the police had been purchased by the defendants' brother, David J. Pelusio, two months earlier. Thomas Pelusio testified in his own defense that sitting in the front passenger seat of the Buick he was unaware of the presence of the shotgun, some three feet long, in the lap of his brother Michael in the back seat of the car, and that if he had known that there was a shotgun in the car he would not have entered it. On cross-examination, however, he conceded [2] that on December 18, 1981, he had been in a vehicle where a shotgun had been seized, and that on January 20, 1982, he had entered another vehicle with knowledge that there were two shotguns in it.

## DISCUSSION

Defendants contend that evidence of their possession of the shotgun and ammunition should have been suppressed as the fruits of an unlawful arrest and search in violation of the Fourth Amendment. The government replies that the police were justified in making an investigatory stop of the white Buick under the principles of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny.

The legality of an investigatory stop depends on (1) the nature and extent of the government's need for the stop, which must be judged according to the importance of its law enforcement interests under the circumstances, and (2) the reason-ableness of the stop, which depends mainly on the degree of police intrusion on the defendants' freedom of movement. *United States v. Streifel*, 665 F.2d 414, 420–21 (2d Cir.1981). To make a stop the law enforcement authority must be aware of "specific articulable facts" giving rise to a reasonable suspicion that the individuals to be stopped are engaged in criminal activity. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975); *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). Upon review, the court must consider the totality of the circumstances, *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). The permissible duration and intrusiveness of an investigative stop depend on the extent of the law enforcement interest and the seriousness of the conduct giving rise to a reasonable suspicion of unlawful activity. *Dunaway v. New York*, 442 U.S. 200, 209, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio, supra*, 392 U.S. at 19–20, 88 S.Ct. at 1878–1879. The longer and more intrusive the stop, the stronger must be the justification for it. *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *United States v. Vasquez*, 638 F.2d 507, 520 (2d Cir.1980), *cert. denied*, 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981). "What might be unreasonable when an officer merely suspects that a minor offense has been committed is not unreasonable when . . . officers have reason to fear that a suspected criminal is armed. The nature of the crime under investigation, the location of the stop, the time of day, the reaction of the suspect to the approach of police are all

ment or representation with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under this chapter, or in applying for any license or exemption or relief from disability under the provisions of this chapter, shall be fined not more than $5,000, or imprisoned not more than five years, or both, and shall become eligible for parole as the Board of Parole shall determine."

2. The concession with respect to the December 18, 1981 incident came only after Thomas denied under oath that he had been present; he was then recalled to the stand by the government and confronted with his signed receipt for the gun.

facts which bear on the issue of reasonableness." *United States v. Harley,* 682 F.2d 398, 402 (2d Cir.1982). In that regard, the Supreme Court has recently noted that "roadside encounters between police and suspects are especially hazardous." *Michigan v. Long,* —— U.S. ——, ——, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1983). When a lawful investigatory stop reveals facts amounting to probable cause for search and arrest the law enforcement ˙officers may proceed accordingly. *See Adams v. Williams, supra,* 407 U.S. at 148, 92 S.Ct. at 1924; *Terry v. Ohio, supra,* 392 U.S. at 10, 88 S.Ct. at 1874.

In the present case the law enforcement need was obvious and the police had articulable facts creating grounds for reasonable suspicion of unlawful activity. A member of an insurgent gang, the defendants' brother Gerald, had been murdered earlier in the day; the initial response was the shotgun blasting of the dominant gang's gambling establishment from a truck strongly resembling that owned by the Pelusios. These circumstances alone entitled the police to infer that the second crime had probably been committed by the defendants in retaliation for the murder of their brother and that further crimes might be committed as part of the internecine gang war in progress. Armed participants in these crimes might reasonably be expected to be found in the vicinity of the Pelusios' home. When a 1976 Buick known to be used by the Pelusios turned into the street and, noting the marked police car, shut off its lights and started backing away from the scene, it greatly enhanced the grounds for suspicion, *United States v. Harley, supra,* 682 F.2d at 401. The police, who were experienced in crime detection, could reasonably conclude that its passengers might be one or more of the Pelusios and that they might be armed. As it turned out, their reasonable suspicion was confirmed.

■ Given the importance of the law enforcement interest in locating the persons suspected of committing serious crimes that day and in preventing further violence, the police intrusion was reasonable. As the

Court noted in *Adams v. Williams, supra,* 407 U.S. at 145–46, 92 S.Ct. at 1923, a policeman cannot under such circumstances "simply shrug his shoulders and allow a crime to occur or a criminal to escape." In this case the conduct of the police in temporarily blocking the defendants' car for a stop was "the essence of good police work." *Id.* at 145, 92 S.Ct. at 1923. Indeed, the policemen would have been remiss in their duty if they had acted otherwise. The mere interception of a moving vehicle for questioning does not require probable cause, *United States v. Brignoni-Ponce, supra,* 422 U.S. at 880, 95 S.Ct. at 2579, and it is not unduly intrusive to require the occupants to step out of an auto even when suspected of lesser crimes. *Pennsylvania v. Mimms, supra,* 434 U.S. at 109–11, 98 S.Ct. at 332–33. In view of the seriousness of the violent crimes that had been committed and the likelihood that the occupants of the Buick might be armed, which was confirmed by the sound of shells being ejected from a gun, Officer Bellucco acted reasonably in holding his weapon drawn at his side. In any event the intrusion proved to be of minimal duration since the officers within a matter of seconds inadvertently saw in plain view the shotgun in Michael's lap, which in light of the other circumstances provided the requisite probable cause. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Since both the investigative stop and the arrest were proper we affirm the district court's denial of defendants' motion to suppress the resulting evidence.

■ Defendant Thomas A. Pelusio also contends that there was insufficient evidence to convict him of having knowingly received the shotgun in violation of 18 U.S.C. § 922(h)(1) or of having aided and abetted its receipt by his brother Michael. The standard by which we are governed on review is whether, viewing the evidence most favorably to the government, *Glasser v. United States,* 315 U.S. 60, 68, 62 S.Ct. 457, 464, 86 L.Ed. 680 (1942), a rational jury could find beyond a reasonable doubt that the defendant had knowingly received the

firearm or aided and abetted such receipt by another. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Direct evidence that the weapon was physically placed in the defendant's hands is not required to convict. To the contrary, receipt of the firearm may be proved by circumstantial evidence, *United States v. Lamare,* 711 F.2d 3, 5 (1st Cir.1983), and possession

> "can be either actual or constructive, exclusive or joint. *United States v. Flores,* 679 F.2d 173, 177 (9th Cir.1982); *United States v. Alverson,* 666 F.2d 341, 345 (9th Cir.1982). 'Constructive possession exists when a person . . . knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.' *United States v. Craven,* 478 F.2d [1329] at 1333 [ (6th Cir.1973) ]. *See also United States v. Birmley,* 529 F.2d 103, 107 (6th Cir.1976); *United States v. Daniels,* 527 F.2d 1147, 1150 (6th Cir.1975)."

■ It is true that at the time of his arrest Thomas, who was in the front passenger seat of the Buick, did not have the shotgun on his person. But he was in close proximity to it; the gun was in the lap of his brother Michael in the back seat, only a couple of feet away. Moreover, the gun was clearly visible, its length (approximately three feet) making it extremely difficult to conceal. The gun had been purchased only two months earlier by their brother David, permitting the jury to infer that they had obtained it from David on the day of their arrest. The murder of their brother provided a strong motive for all three living brothers to aid and abet each other in using the weapon for retaliation purposes. Thomas had previously exercised dominion and control over the auto in which he and the gun were located at the time of his arrest. Finally, although Thomas testified that he would never have gotten into the car if he had known the gun was in it, he was forced after being confronted with a receipt for a shotgun seized from him in another automobile on December 18, 1981 (only nine months before this incident) to effectively concede the untruthfulness of

this testimony. The totality of these circumstances permitted the jury to find beyond a reasonable doubt that Thomas had knowingly received the weapon, either jointly with or constructively through his brother Michael, or had aided and abetted such knowing receipt by Michael.

■ The defendants next contend that the prosecutor engaged in a prejudicial pattern of misconduct in his cross-examination of Thomas and in his summation, which had the effect of denying them a fair trial. Most of the prosecutor's questions and the comments objected to were relevant, permissible and within the bounds of propriety. Although at the outset of trial both sides cooperated in avoiding unnecessary references to "organized crime" before the jury, the Assistant U.S. Attorney did ask Thomas on cross-examination whether he had suspected that his brother Gerald had been shot by someone connected with organized crime. However, under the circumstances this questioning was not improper since it went to Thomas' motive for receiving a gun, which had been opened up by his effort on cross-examination of the arresting officers to show that there was nothing "unusual" justifying their investigative stop. Other cross-examination of Thomas amounted to similar permissible exploration of his motive for receiving the .12 gauge shotgun and his possible connection with the shotgun blasting of the Fernwood Avenue gambling establishment following the murder of his brother. This inquiry included questions as to whether he was a gambler, whether he knew of a gambling establishment at Fernwood Avenue, and whether he had heard that there was a "hit" out for him.

■ Nor was it improper for the prosecutor to cross-examine Thomas regarding prior instances in which he had been present in an automobile with a shotgun. On his direct examination Thomas had testified that he was unaware of the presence of the shotgun in the Buick in which he was a passenger and that he "wouldn't have got in the car" if he had known there was a gun

in it. The purpose of this testimony was to show that he did not participate in receiving or possessing the gun. But the government's cross-examination elicited his admission that he had on at least two recent occasions been present in an auto with a shotgun and had on one of those occasions entered the automobile with knowledge that there were two shotguns in it. The defendant having opened the door by denying that he would have entered a car if he had known there was a shotgun in it, this cross-examination was properly admitted to impeach his credibility and, under Fed. Rules of Evid. 404(b), to show that his presence in the car with the shotgun was intentional and not a mistake or accident. *See Austin v. Loftsgaarden,* 675 F.2d 168, 180 (8th Cir.1982); *Campus Sweater & Sportswear Co.,* 515 F.Supp. 64, 92–93 (D.S.D. 1979) ("similar acts [are admitted] to . . . show that the odds are that repeated acts of the same nature are not accidental. . . ."), *aff'd,* 644 F.2d 877 (4th Cir.1981).

■ It was also proper for the prosecutor in summation to ask "Where is David Pelusio?" Since the shotgun had been purchased recently by David Pelusio, the defendants' brother, he could have been expected, if called as a witness by the defendants, to have explained what he had done with the gun. Presumably, he would have corroborated Thomas' defense that Thomas had nothing to do with the gun, had that been the fact. It was permissible, therefore, for the prosecutor to comment in summation on the defendants' failure to call David as a defense witness. *United States v. Coven,* 662 F.2d 162, 171 (2d Cir.), *cert. denied,* 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 176 (1981); *United States v. Sindona,* 636 F.2d 792, 806 (2d Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981); *United States v. Barnes,* 604 F.2d 121, 148 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980).

■ It is true that at times the Assistant U.S. Attorney engaged in some unnecessary, irrelevant and improper theatrics, such as asking Thomas on cross-exami-

nation, "Have you ever cheated on your wife?" This, of course, was hitting below the belt and is not to be condoned. The objection to the question should have been sustained. But no resulting prejudice is shown; indeed the witness properly answered, "It is none of your business." The error was therefore harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Most of the prosecutor's excesses, moreover, were not objected to by the defendants and cannot be raised now, absent a showing of plain error. *United States v. Canniff,* 521 F.2d 565, 572 (2d Cir.1975), *cert. denied,* 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976). No such showing has been made.

■ Lastly, we are persuaded that, absent any evidence that the defendants received the .12 gauge shotgun and the five rounds of ammunition on separate occasions, they could not lawfully be found guilty of receipt of the gun and the ammunition as separate crimes forming the subject of multiplicitous counts. Title 18 U.S.C. § 922(h) makes it unlawful for any person indicted for or convicted of a felony "to receive any firearm or ammunition" that has been shipped in interstate commerce. *See* n. 1, *supra.* This language, unlike that of some statutes (e.g., mail or wire fraud, 18 U.S.C. §§ 1341, 1343), does not state whether each firearm or round of ammunition, absent proof that it was separately received, could nevertheless be the subject of a separate count and thus be punishable as a separate crime involving a potential consecutive sentence. Nor does the legislative history indicate an intent to permit fragmentation of a load of unlawfully received firearms so that each may form the basis of a separate charge. *See, e.g.,* H.R.Rep. No. 1577, 90th Cong., 2d Sess. *reprinted in* 1968 U.S.Code Cong. & Ad. News 4410. In construing a similar ambiguity in the Mann Act, 18 U.S.C. § 2421 et seq. (whether simultaneous transportation of more than one woman across state lines for immoral purposes permits multiplicious counts), the Supreme Court made it clear that the rule of lenity dictates that only one

offense may be charged. *Bell v. United States,* 349 U.S. 81, 83–84, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955). This principle applies with equal force to the construction of 18 U.S.C. § 922(h). *United States v. Oliver,* 683 F.2d 224, 232–33 (7th Cir.1982). When Congress wishes to make each act or unit a separate crime it knows how to do so, as it demonstrated in the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, which specifically define each mailing or transmission as an offense. *See United States v. DeFiore, et al.,* 720 F.2d 757, 763, 765–66 (2d Cir.1983). The statute before us contains no comparable definition. Our view follows that of eight other circuits that have considered the issue, either with respect to 18 U.S.C. § 922 or 18 U.S.C.App. § 1202(a), which provides that any convicted felon "who receives, possesses, or transports in commerce or affecting commerce . . . any firearm" is guilty of a crime.[3]

We have examined the other claims of error asserted by the defendants and find them to be meritless. The trial judge was not required under the Sixth Amendment to strike the testimony of Officer Bellucco, who asserted his Fifth Amendment privilege when the defendants attempted to cross-examine him regarding pending departmental charges against him. The charges were wholly unrelated to this case or to any matters brought out on the government's direct examination of the witness. Indeed, they pertained to events postdating the events of this case. The defendants simply sought to explore the witness' general credibility by cross-examining him with respect to collateral matters.

In such circumstances, absent any showing of prejudice to the defendants, and none is shown in this case, the witness' assertion of the privilege will be upheld and his direct testimony permitted to stand. *Dunbar v. Harris,* 612 F.2d 690, 692 (2d Cir.1979); *United States v. Cardillo,* 316 F.2d 606, 611 (2d Cir.), *cert. denied,* 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963). To the extent that the defendants were trying to show that Officer Bellucco was biased against the defendants because of personal animosity, they were able to make that argument to the jury quite clearly and forcefully even without reference to the administrative charges.

The judgments convicting Michael A. Pelusio and Thomas A. Pelusio of the offenses charged in Counts I and II of the indictment, respectively, are affirmed. The judgments convicting them of Counts IV and V, respectively, are reversed and remanded to the district court with directions to dismiss these two counts.

WINTER, Circuit Judge, dissenting in part and concurring in part:

Since I would affirm the convictions on counts IV and V, I respectfully dissent.

First, the language "receive any firearm or ammunition" seems to me to state that a receipt of a gun *and* ammunition is two crimes, whether or not the items are simultaneously received. Second, if the purpose of the legislation is to prevent access to firearms by indicted or convicted felons because of the danger that they will use them to commit further crimes, that danger is

---

**3.** In addition to *United States v. Oliver, supra, see United States v. Frankenberry,* 696 F.2d 239, 244–46 (3d Cir.1982) (§ 922(h)); *United States v. Marino,* 682 F.2d 449, 453–55 (3d Cir.1982) (§ 12–2(a)); *United States v. Mason,* 611 F.2d 49, 50–52 (4th Cir.1979) (§ 922(h)); *United States v. McCrary,* 643 F.2d 323, 325–28 (5th Cir.1981) (§ 1202(a)); *United States v. Hodges,* 628 F.2d 350, 351–52 (5th Cir.1980) (§§ 922(h), 1202(a)); *United States v. Carty,* 447 F.2d 964, 965–66 (5th Cir.1971) (§ 922(i)); *United States v. Rosenbarger,* 536 F.2d 715, 720–21 (6th Cir.1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977) (§ 1202(a)); *United States v. Calhoun,* 510 F.2d 861, 869 (7th Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1683, 44 L.Ed.2d 104 (1975) (§ 1202(a)); *United States v. Powers,* 572 F.2d 146, 150–52 (8th Cir.1978) (§ 922(h)); *Brown v. United States,* 623 F.2d 54, 56–59 (9th Cir.1980) (§ 922(a)(6)); *United States v. Valentine,* 706 F.2d 282, 292–94 (10th Cir.1983) (§§ 922(h), 1202(a)). Each of these cases dealt with simultaneous receipt of more than one gun; *Oliver* itself dealt with the precise issue before this court—simultaneous receipt of a gun and ammunition.

Our research has not uncovered a single case holding to the contrary.

much greater when a fully loaded firearm is received than when only the weapon or the ammunition but not both are obtained.

` Both the language and purpose of the statute thus seem contrary to the result reached by the majority. Since I concur in the remainder of Judge Mansfield's opinion, I would affirm the convictions on all counts.