Lawrence SIMMONS, Petitioner,

v.

Patrick ARVONIO, Superintendent, East
Jersey State Prison, Robert J. Del Tufo,
Attorney General of the State of New
Jersey, Office of the Passaic County
Prosecutor and Paterson Police De-
partment, Respondents.

Civ. No. 86–4274.

United States District Court,
D. New Jersey.

June 24, 1992.

John Vincent Saykanic, Clifton, N.J., for petitioner.

Ronald S. Fava, Passaic County Prosecutor, Paterson, N.J., for respondents.

## OPINION

DEBEVOISE, District Judge.

This is an action by petitioner, Lawrence Simmons pursuant to 28 U.S.C. § 2254 to obtain a writ of habeas corpus.

## PROCEDURAL HISTORY

Petitioner was charged in a Passaic County Indictment, along with codefend-

ants David Wilson[1] and Donald Phillips,[2] for the May 27, 1977 murder of Dr. David Doktor (*N.J.S.A.* 2A:113–1); murder while armed (*N.J.S.A.* 2A:151–5); and conspiracy to commit robbery (*N.J.S.A.* 2A:98–1).[3] Petitioner and codefendant Phillips were charged in a separate indictment with the robbery (*N.J.S.A.* 2A:141–1) of a second individual a short time later on May 27, 1977. Petitioner was tried separately and convicted on all charges after an 11 day jury trial in October and November 1977.

On December 21, 1977 petitioner was sentenced to life in prison on the murder conviction; a consecutive term of nine to ten years on the murder while armed conviction; a concurrent two to three year term on the conspiracy to rob conviction; and a consecutive sentence of 12 to 15 years on the conviction for the robbery of a second individual.

Shortly after petitioner was sentenced he began the long and often frustrating process of obtaining direct appellate review of his conviction. The details attendant to Petitioner's odyssey are thoroughly discussed in my earlier opinion, wherein I granted Petitioner a conditional writ of habeas corpus. *See Simmons v. Beyer*, 689 F.Supp. 432 (D.N.J.1988). Thus, I will not rehash those details in this opinion. Pursuant to the conditional writ, the state was directed to either grant the Petitioner an effective appeal to the appellate courts or grant the petitioner a new trial.

On August 9, 1988 the Passaic County Prosecutor's Office filed, on behalf of Petitioner, an application for leave to appeal *nunc pro tunc* and for a remand to the trial court to reconstruct the record.[4] The motion was granted; reconstruction of the record was completed and the certified record was filed with the Appellate Division on October 4, 1988. On November 14, 1988 I denied Petitioner's motion challenging the sufficiency of the reconstructed record. *See Simmons v. Beyer*, Civ. No. 86–4274 (D.N.J. 14 November 1988).[5]

On January 8, 1989 petitioner moved for a limited remand to the trial court in order to seek a new trial on the ground of newly discovered evidence based upon affidavits of David Wilson who recanted his testimony from the 1977 trial. A supplemental certification was submitted on January 25, 1989. On February 9, 1989 the Appellate Division granted that motion and ordered that such remand proceedings be completed within 60 days. On March 9, 1989, a motion for a new trial was filed on petitioner's behalf with the trial court. Evidentiary hearings were held before Judge Marchese on April 3 and 4, 1989. In an April 6, 1989 oral decision, the judge denied petitioner's motion for a new trial. An order to that effect was entered on April 10, 1989. Thereafter, petitioner filed an amended notice of appeal to include the denial of that motion in his appeal.

Roughly thirteen years after the conclusion of his trial, Petitioner was finally accorded appellate review of his conviction. His conviction was affirmed by the Appellate Division on or about July 13, 1990.

---

1. Wilson testified under a grant of immunity as the State's witness against the other defendants and in return the charge against him was subsequently dismissed.

2. Codefendant Phillips was convicted on all counts in a jury trial shortly before Petitioner's trial. He was sentenced to an aggregate term of life plus 21 to 25 years. His convictions were affirmed in *State v. Phillips*, Docket Number A–2924–77 on May 2, 1980. Certification was denied on July 17, 1980, 85 N.J. 115, 425 A.2d 275 (1980).

3. All of these offenses occurred prior to the adoption of Title 2C, the New Jersey Penal Code. Hence the provisions of Title 2A were applicable at the time of the indictment, trial and sentence.

4. As noted in my earlier opinion, the state's decision to grant petitioner a direct appeal, rather than a new trial, placed the onus upon the state to reconstruct the missing portions of the transcripts from Petitioner's trial. *See Simmons v. Beyer*, 689 F.Supp. at 449.

5. I concluded that petitioner must first challenge the adequacy of the reconstructed record before the Appellate Division of the Superior Court of New Jersey; "Once the state courts have had an opportunity to review petitioner's federal claims, they are subject to re-examination in a habeas corpus proceeding." *Simmons*, op. at 4.

See State v. Lawrence L. Simmons, A–6277–87T1 (App.Div.1990). Petitioner then filed a petition for certification which was denied by the New Jersey Supreme Court on or about October 22, 1990. See Order; annexed as Exhibit Da 498 to Petitioner's Appendix.

Subsequent to the exhaustion of his state remedies, Petitioner moved to reopen his petition for habeas corpus before the federal district court. Petitioner's motion was granted on November 14, 1990.

## STATEMENT OF FACTS

The following sequence of events, developed at trial, is meticulously set forth in the opinion of the New Jersey Appellate Division. See State v. Simmons, op. at 18–32.

Early in the morning on May 27, 1977 (approximately 1:30 a.m.), Dr. David Doktor, an elderly physician, received an emergency call requesting his attendance at Barnert Memorial Hospital. The call was placed to his home on 14th Avenue in Paterson. Upon leaving his home, Dr. Doktor was brutally beaten and robbed. He died from the blows sustained in the attack. On that same morning, George Marshall was also beaten and mugged by two individuals.

During the early morning hours of May 27, 1977 (about 1:00 a.m.), David Wilson [6] returned to the home of Donald Phillips at 738 East 23rd Street, Paterson, where Wilson had been living for quite some time. Wilson testified that the petitioner and co-defendant Phillips entered the apartment together. He further testified that they "were smoking refer and drinking beer." The beer was contained in quart bottles. Wilson had known Phillips at this time for approximately four months, but had not met the petitioner prior to that night.

The three men discussed stealing a car. Petitioner allegedly stated that "he wanted to do a stickup with the car." Phillips then asked Wilson, who was allegedly adept at stealing cars, if he had any keys to General

Motors cars. Allegedly, petitioner produced a General Motors automobile key and, tossing it to Wilson, asked if it could be used to steal a car. Wilson replied that it might. Petitioner then told the others that he knew of a car they could steal on 14th Avenue near 26th Street in Paterson.

Wilson accompanied Phillips downstairs to the first floor hall closet where Phillips obtained a yard-long length of auto exhaust pipe with grooves in it. When Wilson asked Phillips what the pipe was for, Phillips said it was to break the window of the car if the key didn't work. Wilson, who would be acting as the "lookout," would then "hot-wire" the car.

On the night of the murder petitioner was wearing black pants, a short sleeved light blue polo shirt and a plaid shirt-type jacket. He also had on a sleeveless yellow undershirt with brown trim, a pair of black socks and suede shoes. Phillips also had on black pants, and wore a long sleeved black shirt, white athletic socks with black and yellow stripes and a pair of white Pro-Ked sneakers with blue and red trim. Wilson was dressed in a blue and white striped sweater, a blue belt, peach pants, a brown stocking cap and tan checked hat with a small front brim. He also wore a brown bodysuit and black, heeled shoes.

At 5'2" Wilson was the shortest of the three, but appeared about 5'5" in his high heeled shoes. Phillips was six feet tall. Petitioner was about 5'6" tall and wore his hair in braids on the night he was arrested.

At about 1:30 a.m., the three individuals allegedly left the house, and walked down East 23rd street to 14th Avenue where they headed easterly towards 26th street and the car petitioner suggested they could steal. As they walked down 14th Avenue, Phillips carried the pipe and a quart bottle of beer. While Phillips stopped and waited for petitioner, who had lagged behind, Wilson continued walking, and upon reaching 26th street turned and saw the petitioner, now about a block behind, place the beer

---

**6.** Wilson was the state's key witness in the case against petitioner. At trial Wilson's testimony implicated petitioner in the murder and the mugging. Wilson recanted his testimony in 1985, after he was sentenced to State Prison. He contended that he was coerced into lying at trial by the police and the prosecutor.

bottle in the middle of 14th Avenue about 10 to 15 feet from the sidewalk.

Wilson crossed the 26th Street intersection and, while intending to wait for the other two individuals to catch up with him, was frightened by the headlights of a car driven by Mrs. Garcia. Wilson hid in the bushes about 100 feet from the corner and watched Mrs. Garcia park on 14th Avenue near the corner of 27th Street and exit her vehicle. After parking her car, Mrs. Garcia started toward her house and then went back to the car where she had left her house key. After retrieving her key, she went into her house. Emerging from the shrubs, Wilson stood and watched Phillips and the petitioner cross 26th Street. Wilson then started walking up 14th Avenue. Eventually, Phillips and the petitioner caught up with Wilson at the intersection of 27th Street. As the two men approached him, walking side-by-side, Wilson saw that Phillips was still carrying the pipe.

Mrs. Garcia lived in the house on the corner of 26th Street and 14th Avenue. As she stood on her front porch, which faced 26th Street, and opened her front door, she saw a black man near the corner walking on 26th Street in front of her house as if he were "looking for something." She got a glimpse of the side of this man's face and observed that he had puffy cheeks and "well, like braids or something on the head." She went inside and later peered out of her kitchen window, which overlooked 14th Avenue, and saw two black men dressed in dark clothing walking on her side of 14th Avenue towards 27th Street. She testified "they were walking, had something in their hand, like a stick or something, between both men." After she lost sight of the individuals, Garcia went outside to the edge of her porch, fearful that someone was looking into her car, looked up 14th Avenue, saw movement in the distance and then went inside.

As the petitioner, Phillips and Wilson gathered at the intersection, about to make a right turn onto 27th Street, petitioner allegedly pointed to an old car, parked on 14th Avenue near the intersection and said,

"there goes a car we can steal." The three men walked down 14th Avenue towards the car which was parked in front of a new vehicle. Wilson stopped near a driveway, about 20 feet from the newer car, as petitioner and Phillips stood behind the intended vehicle.

Meanwhile, during those early morning hours of May 27, 1977, Mrs. Purtell, a registered nurse who was affiliated with Barnert Hospital in Paterson, was on duty in the hospital's morgue. At 1:30 a.m., she telephoned Dr. David Doktor, to advise him of a medical emergency at the hospital. Dr. Doktor dressed and approximately 15 minutes later, left his residence on 14th Avenue.

From his lookout position, Wilson saw the elderly physician descend the front stairs of his house about 20 feet away. Phillips and the petitioner were hiding behind a car a few feet or so away from the doctor. Upon noticing Dr. Doktor, Phillips allegedly tapped the petitioner and said, "let's get him."

According to Wilson, as the doctor walked between the two parked cars, the petitioner "came up from behind and punched him in the face," knocking him to the ground. Phillips then grabbed the "old man" by the shoulders, dragged him into the roadway and started punching him in his face. According to Wilson, the petitioner "[w]as hitting him in his body and then the lower part of his body. The man then went down to the ground. Then he tried to get up, as he was getting up he was moving himself in front of the car. Mr. Simmons [petitioner] then came over and punched him in the stomach." Phillips then removed a piece of plastic from his back pocket, wrapped it around his hands, and retrieved the pipe from its hidden location near the rear tire of the old car that the three were attempting to steal. Phillips repeatedly struck the doctor in the head with the pipe.

By this time, Wilson had moved closer, and was now standing between the two parked cars about 5 feet from Phillips, the petitioner and their victim. He watched as Phillips continued to bludgeon the doctor's

head with the pipe and stated "he hit him a number of times." As Phillips was hitting the doctor with the pipe, the petitioner was punching him "in the stomach and his back and his ribs and his side." Finally, petitioner kicked the doctor in the head. He then grabbed the physician's back pants pocket and ripped it off his pants, taking with it the doctor's wallet. The petitioner, Phillips and Wilson the fled, leaving the physician unconscious and lying in the roadway.

Phillips and Wilson fled across the street. The petitioner, however, ran up a driveway located on the same side of 14th Avenue. As the two men ran across the street, Phillips was unwinding the plastic from his hands. While he was fleeing, the plastic snagged on a fence across the street from the murder scene where the police found it.

The petitioner eventually caught up with Phillips and Wilson on the corner of 14th Avenue and 27th Street. Wilson first saw the petitioner as he rounded the corner of 28th street and noticed that he was not wearing the plaid jacket he had on when the three men had left Phillips' residence. The three men then raced down the opposite side of 14th Avenue towards 23rd Street and the School 13 playground. Phillips, who still held the pipe as they ran, threw the pipe away as they fled down 14th Avenue. It was later recovered by the police.

Meanwhile, Mrs. Garcia, who had earlier driven to her 26th Street home, sat in her kitchen. A little later, after initially looking out her kitchen window and observing the two men walking up 14th Avenue, she again looked out her kitchen window, this time to see three men running down the opposite side of 14th Avenue towards 25th Street.

At 2:00 a.m., another witness left work and started her 8 to 10 minute trip home to Elmwood Park. As she drove east on 14th Avenue she observed, about one-third of the way into the block between 25th and 26th Streets, an empty beer bottle in her lane of traffic. In order to avoid hitting the bottle, she had to swerve and drive into the opposite lane. About a block and one-

half further away, her headlights picked up what appeared to be to be a bundle of rags, garbage, or "something laying in the road." As she drove closer, she saw that it was not rags, but a body lying on the south side of 14th Avenue.

Upon reaching the corner of 14th Avenue and 23rd Street, the petitioner, Wilson and Phillips entered the School 13 playground. When the petitioner announced that the doctor's wallet contained no money, Phillips told him to "go hide the wallet." While Phillips and Wilson waited and watched, the petitioner ran to Phillips' house and returned "a few minutes later."

The trio then spotted George Marshall coming through the playground. Phillips said, "let's get a quarter off him;" the petitioner replied, "let's go." They walked up 23rd street, past Marshall, and then turned around. The petitioner and Phillips followed Marshall across the street to the corner of 23rd Street and 14th Avenue, while Wilson stood on the school yard side of 23rd Street. Phillips approached Marshall and asked for a quarter. When Marshall replied that he did not have one, Phillips told him "you're a liar" and punched him in the eye. Marshall grabbed Phillips and threw him against a nearby fence. At this point, the petitioner came up behind Marshall and ripped his pocket off, taking Marshall's wallet. As his attackers walked away down 23rd Street, Marshall called out, referring to the wallet, "I don't know where you're going because there is nothing in it." The petitioner then brought the wallet back to Marshall and beat him up once again. Afterwards, Marshall discovered that two dollars and some change were taken from him. Marshall later described the petitioner as having a "sort of muscular build and looked like he was a little shorter than the other gentleman and he had like a white slipover tee shirt or some kind of shirt, slipover shirt on, short sleeved." In addition, Marshall stated that the petitioner had a "short hairdo, like it was braided."

Anthony Giordano was asleep in his home, located on the corner of East 23rd Street and 14th Avenue. Sometime after

2:00 a.m., Giordano was suddenly awakened by a strange noise. He went to the kitchen and looked out the window overlooking the corner. Since there was a street light on, Giordano was able to see what he thought to be three black males mugging a white male. One of the blacks was beating the white male as the other two were "just standing by." Giordano yelled out the window and told the men to leave the man alone. In reply, one of the attackers told Giordano to "shut up."

At the approximate time of the robbery, another Paterson resident, Mrs. Bagby, who lived on 23rd Street was awake in bed waiting for her daughter to come home. She testified that she was disturbed by "someone that was hollering, trying to get some help." She said what she heard sounded like a man yelling and it sounded like he was being mugged or attacked or something. She then went outside onto her front porch to see if her daughter. who she knew had just arrived in a car across the street, was all right. Still hearing the man yelling, she returned inside to telephone the police and report a mugging.

Meanwhile, her daughter was seated in a parked car on the right hand side of 23rd Street near 14th Avenue where she observed two black youths assault a white man while a third black youth watched. She stated, "I saw a Caucasian man coming down the street and three black youths passing him and then turning around, and two of the black youths grabbing him and held him and the other began to strike him and they were pulling at his pocket, at his back pocket." She began to flash the car lights on and off and honk the horn hoping that she would scare the attackers away. She described the young black men as ranging from 5′5″ to 5′9″ in height. She stated that one of the individuals had on a white short sleeved pullover shirt and corn rows in his hair. The second man wore dark clothing. She described the third person, the nonparticipant, as about 5′5″ tall and wearing a wide or white striped sweater.

After Mrs. Bagby called the police she again went outside, down her front stairs and halfway into the street, calling out that she had notified the police. She repeatedly yelled out to determine if the victim was all right. A tall black man then came around the corner and told her that "the mf'er is alright." She described this individual as seeming "to be tall, about my complexion. His hair was sort or close-cropped, I don't know if it was braided or it was cut close, by that I meant it wasn't brushed in an afro." She watched for approximately two or three minutes as the three black men walked past the lighted intersection on 14th Avenue and 23rd Street and continued down 23rd Street toward School 13 and 15th Avenue.

Police patrol cars were quickly dispatched to the area. As a result of the incident, Wilson was apprehended near 15th Avenue and 22nd Street. Phillips, who was perspiring heavily and smelled of alcohol, was apprehended near Madison Avenue and Ellison Place. The petitioner was apprehended near the intersection of Ellison Place and Madison Avenue. Officer Micks noted that when he stopped the petitioner, he had a very rapid heartbeat and appeared to be nervous. The petitioner gave the officer his name and address and said that he was on his way home from visiting his sister, Wanda Addison. The petitioner said that he was uncertain of her address because she had recently moved.

The petitioner was brought into police headquarters at approximately 3:00 a.m. on May 27, 1977. He was escorted into a room and told to read aloud the Miranda rights listed on a plaque on the wall. The petitioner did so and then stated that he understood those rights. About one hour later Detective Rafferty and Hennison asked the petitioner: (i) if he knew Wilson and Phillips and (ii) what he was doing in the area where he was apprehended. The petitioner responded that he did not know either Wilson or Phillips and further replied that he had been visiting his sister before he was apprehended. He also told Detective Rafferty that he did not wish to say anything more. Later, the detectives returned with Phillips and Wilson, who both identified the petitioner in his presence. Again petitioner insisted that he did

not know either of them. At about 10:00 a.m., the petitioner was advised that Wilson had given police a written statement implicating the petitioner in the murder. The petitioner then stated, "I figured he would squeal, that rat bastard. I will kick his ass when I get him over at the jail." Later in the afternoon, as the petitioner, Phillips and Wilson were being transported for booking in an elevator, the petitioner told Wilson, according to Detective Rafferty's testimony, that he would "beat Wilson up when he gets him over the county jail." The petitioner testified and denied making any statements, except the one made in the elevator.

Mrs. Garcia later gave a description of the three young men she observed to Detective Torres, stating "that they were all black, young, between 16, 17 years old or maybe 18 years old wearing dark clothing. Also one was wearing a dark colored handkerchief of some kind around his head." At the police station, Garcia was also shown some photographs and indicated that one of them looked like one of the perpetrators, but that she was not sure. The next day as she read *The Paterson News*, she saw the three men depicted in the photograph as looking like one of the men she saw the night before. She saved the newspaper and turned it over to members of the Prosecutor's Office later that summer, pointing out the petitioner's photograph as being "similar" to one of the men she saw the night of the murder. In addition, she was shown an eight photograph array and identified the petitioner's photograph.

Mrs. Bagby also saw a copy of *The Paterson News* the following day, and recognized two of the men depicted in the newspaper photograph as similar to the attackers of Marshall. Bagby pointed out petitioner's photograph as being similar to or resembling the assailant who stated that "the mf'er is all right." Bagby also described Phillips' photograph as resembling the taller and slim one." While she was also shown the eight photograph array, she was not able to pick out any photographs of the assailants. Her daughter, also shown the photograph array, selected the petitioner's photograph as "the person closely resembles one of the people I saw that night."

Giordano also saw the photographs in *The Paterson News* and recognized one of the men as one of the three assailants of Marshall. Giordano was also shown the photographic array and selected the photograph of the petitioner.

Marshall also saw the photographs on the front page of *The Paterson News* the following day and recognized those of the petitioner and Phillips as "two gentlemen that looked [like] the two guys that ripped me off." Marshall was also shown the eight photograph array and selected the two photographs. He chose the one of Phillips as it "resembles the guy that asked me for the quarter and hit me in the eye, the one I threw up against the fence." Marshall also selected the petitioner's photograph stating, "that's the one that took my pocket out and took my wallet."

Michele Yasso, a forensic chemist with the New Jersey State Police, qualified as an expert witness at trial and testified that she examined the clothing which the petitioner, Phillips and Wilson were wearing for blood stains. She said she found no traces of blood on them. Yacco also analyzed the clothing of Dr. Doktor and found blood on the sport's jacket, the red slacks, the right and left shoes, the pink shirt, the undershirt, and the pair of boxer shorts. Yacco analyzed Doktor's blood type and found that it was blood type "O." She said she tested and analyzed five areas of bloodstains on the length of pipe and concluded they were of human origin and blood type "A."

However, Richard Coumbis, the chief state toxicologist testified that he examined the pipe, and that based on his tests, the blood found on the pipe was type "O." Coumbis testified that in his opinion Doktor's injuries, as depicted in certain State exhibits, specifically the ridges and depressions appearing on the victim's head, were consistent with the ridges and depressions on the pipe.

Coumbis knew before he analyzed the blood that the pipe had previously been examined by State Police Lab personnel who had identified the blood as type "A." He also knew that the victim's blood type was "O." Coumbis did not retest the areas of the pipe which had been tested previously.

The petitioner testified at trial that on May 26, 1977 he resided at 2 12th Avenue in Paterson with his mother, brother and sisters, and that he left home to go to the poolroom sometime that evening. He said he later returned and left the house again between 10:30 and 11:00 p.m. to go to the house of his sister, Wanda Addison who had been living for two or three weeks on the first floor of a house on East 23rd Street where Phillips' mother lived upstairs. The petitioner testified that he and Phillips did not get along and that he did not associate with Phillips.

The petitioner testified that he later answered a knock on the door and observed "two short dark-skinned men." The petitioner testified that he did not know either of the men, but later learned that one of them was David Wilson, whom he had seen previously a couple of times on the street. The petitioner said that he had also seen the other person on the street, but did not know him.

The petitioner maintained that Wilson was wearing a stockingcap on his head. The other individual was short, dark skinned, with "short cut hair." After opening the door, the petitioner returned to his sister's apartment and did not know where the two individuals went. Simmons said he later heard footsteps coming down the stairs and observed Phillips, wearing a long black shirt and black pants, and the two other individuals on the porch. The three then left the porch.

The petitioner said he had a can of beer with his sister, and left his sister's apartment at about 1:45 to 2:00 a.m. He then began walking down 23rd Street back to his mother's house. After crossing 15th Avenue, the petitioner observed Phillips and a white man and two other persons whom he did not recognize. The petitioner testified that Phillips and the white man were "tussling, arguing or fighting ..." The petitioner asserted that he yelled, "hey" and started walking through the School 13 playground towards Ellison Place.

### A. Exhaustion

Pursuant to 28 U.S.C. § 2254(b) & (c), state prisoners must exhaust all available state judicial remedies before a federal court will consider a petition for habeas corpus. *See Duckworth v. Serrano*, 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981). "[This] requirement ... serves to minimize friction between our federal systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). Because petitioner raised the same twelve objections in his appeal and petition for certification as he raises in his petition for habeas corpus, I am satisfied that he has exhausted all available state remedies. Accordingly, his contentions must be addressed on the merits.

### B. Scope of Review

The writ of habeas corpus has a limited scope. Federal courts do not sit to retry state cases *de novo*, but rather, to review for violations of federal constitutional standards. *Milton v. Wainwright*, 407 U.S. 371, 377, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1 (1977).

### C. Petitioner's Claims

#### I. Miranda Claim

The petitioner argues that admission of the following statements violated his *Miranda*[7] rights, Fifth Amendment rights, and New Jersey State common law privilege against self-incrimination: (i) petitioner's statement that he did not know either Phillips or Wilson; (ii) petitioner's statement that he had been visiting his sister; (iii) petitioner's remark "I will kick [Wil-

---

7. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

son's] ass when I get him over in the jail;" and (iv) petitioner's statement that he would beat Wilson up when he got to the jail.

■ *Miranda* stands for the principle that no statements of an accused, made in a custodial setting, may be admitted unless the prosecution demonstrates that certain procedural safeguards were followed.[8] 384 U.S. at 444, 86 S.Ct. at 1612. These prophylactic measures are required only when the suspect is in custody and is subject to interrogation. *Id.; see also Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

On October 28, 1977, during petitioner's trial, a *Miranda* hearing was held. The trial judge found that: (i) the petitioner's statements denying that he knew Phillips and Wilson were admissible; (ii) the petitioner's statement that he knew that Wilson would squeal was voluntary and made with full knowledge of his constitutional right to remain silent[9]; (iii) and that the remark made by the petitioner in the elevator was also voluntary and admissible. The petitioner's objection to the admissibility of his statement that he had been visiting his sister was overruled.

■ As noted above, petitioner was first questioned by Officer Micks after he was stopped at the intersection of Ellison Place and Madison Avenue. In response to Officer Micks' questions, the petitioner gave his name and address. He also indicated that he was coming from his sister Wanda Addison's house but he could not remember her address because she had recently moved to a new residence. Petitioner contends that these statements should not have been admitted at trial.

I need not reach the issue of whether *Miranda* warnings should have been issued prior to Officer Micks' questioning because I conclude that the admission of these statements did not prejudice the petitioner. Indeed, petitioner's testimony at trial corroborates the statements which he made to Officer Micks. Thus, I fail to see how the admission of the statements violated his *Miranda* rights.

■ The voluntariness of a statement is a legal issue requiring an independent legal determination by the federal court. *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985); *Riddick v. Edminston,* 894 F.2d 586, 589 (3d Cir.1990). However, in a federal habeas action, a state trial judge's findings as to the subsidiary facts are presumptively correct under 28 U.S.C. § 2254(d). "[F]ederal courts ... [in habeas] proceedings must not disturb the findings of state courts unless the federal habeas court articulates some basis for disarming the presumption that they are correct and may be overcome only by convincing evidence." *Smith v. Phillips,* 455 U.S. 209, 218, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) (citing *Sumner v. Mata,* 449 U.S. 539, 551, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981)).

At the petitioner's trial, the judge found that the petitioner did not invoke his right to remain silent until after he had already stated that he had been at his sister's house and that he did not know either of the suspects. No colorable grounds have been advanced to reject the state court's finding.

■ Petitioner contends that the police were required to reissue *Miranda* warnings before presenting Wilson and Phillips for identification and before advising him that Wilson gave a statement implicating him in the murder. He maintains that his statement was obtained in violation of *Miranda* and should have been excluded from evidence. Furthermore, he contends that the remark he made about Wilson in the

---

**8.** These safeguards include informing the accused that (i) he has the right to remain silent; (ii) any statement he chooses to make can be used against him in a court of law; (iii) he has the right to have an attorney present at questioning; and (iv) he has the right to have an attorney appointed if he cannot afford one.

**9.** The trial judge concluded that the detectives' statements to the petitioner regarding Wilson's confession was not tantamount to interrogation. Relying upon *Michigan v. Mosely,* 423 U.S. 96, 107, 96 S.Ct. 321, 328, 46 L.Ed.2d 313 (1975) the trial judge concluded that petitioner's rights were not violated.

elevator was obtained in violation of *Miranda.*

■ In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 the Supreme Court addressed the meaning of the term "interrogation" under *Miranda.* The Court concluded that the:

*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

446 U.S. at 300–01, 100 S.Ct. at 1689–90. Generally, remarks made by the authorities concerning evidence which is unfavorable to the defendant is not characterized as interrogation. Such information is typically communicated "attendant to arrest and custody" in order to give the defendant an opportunity to make an informed intelligent waiver of a previously invoked right to remain silent. *See Jenkins v. Bara*, 663 F.Supp. 891, 895 (S.D.N.Y.1987) (no compulsion on the part of the police where they turned up volume of police radio broadcast concerning the discovery of evidence in the vicinity where the suspect was arrested); *United States v. Pheaster*, 544 F.2d 353 (9th Cir.1976) *cert. denied* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977) (confession made while defendant was being transported to jail after agents recited the evidence they had obtained against him including his fingerprints on a ransom note, held to be admissible despite the defendant's demand to see an attorney).

In the instant case, the appellate court concluded that the police did not subject the petitioner to interrogation when they brought Wilson and Phillips into the room to identify him: "The police, as a normal incident to custody and arrest, had the right to have other witnesses, who, including those Simmons said he did not know, identify Simmons if they could." *Sim-*

*mons*, op. at 40. Similarly, the court concluded that the police did not subject the petitioner to interrogation when they advised him that Wilson had given a statement which implicated the petitioner in the murder. *Id.* Thus, the court concluded that the petitioner's *Miranda* rights were not eviscerated.

I concur with the conclusion of the New Jersey Appellate Division that the conduct of the police did not rise to the level of interrogation. Although there may have been an element of compulsion present, it did not "reflect a measure of compulsion above and beyond that inherent in custody itself." *See Innis*, 446 U.S. at 300, 100 S.Ct. at 1689. Moreover, the unsolicited comment made by the petitioner in the elevator while being transported to another location was clearly a spontaneous utterance which was not the product of custodial interrogation. *See United States v. Vasquez*, 857 F.2d 857, 862 (1st Cir.1988). Thus, the admission of petitioner's statements was not violative of his constitutional rights.

■ Furthermore, I conclude that any statements made by the petitioner were the product of a knowing, voluntary waiver of his *Miranda* rights. In *Michigan v. Moseley*, 423 U.S. 96, 107, 96 S.Ct. 321, 328, 46 L.Ed.2d 313 (1975) the Supreme Court stated that, pursuant to *Miranda*, interrogation must cease once the person in custody indicates his desire to remain silent. The Court observed, however, that *Miranda* does not explicitly prohibit resumption of further questioning. Consequently, the Court concluded that "[T]he admissibility of statements obtained after the person in custody had decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was scrupulously honored." *Id.* at 104, 96 S.Ct. at 326.

■ To determine the voluntariness of a confession, the court must consider the effect that the totality of circumstances has upon the will of the defendant. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). The question in each case is whether the defendant's will was over-

borne when he confessed. *See Miller v. Fenton*, 796 F.2d 598 (3d Cir.1986) (citing *Schneckloth*, 412 U.S. at 225–26, 93 S.Ct. at 2046–47).

 It is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect. *See Miller v. Fenton*, 796 F.2d at 650 (citing *Haynes v. Washington*, 373 U.S. 503, 514–15, 83 S.Ct. 1336, 1343–44, 10 L.Ed.2d 513 (1963)). For example, the interrogator may play on the suspect's sympathies or explain that honesty might be the best policy for the criminal who hopes for leniency from the state. *See Miller v. Fenton*, 796 F.2d at 605 (citing *Rachlin v. United States*, 723 F.2d 1373, 1378 (3d Cir.1983)). These ploys may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary. Thus, the question in this case is whether the petitioner was coerced or deprived of his ability to make an unconstrained decision to waive his *Miranda* rights.

I conclude that statements made by the defendant when he was; (i) confronted by Wilson and Phillips, (ii) confronted with Wilson's confession; and (iii) placed in an elevator with Wilson were not the product of compulsion or coercion on the part of the authorities. Petitioner's statements were made voluntarily and as such they were properly admitted into evidence at trial. *See United States v. Hodge*, 487 F.2d 945 (5th Cir.1973) (a voluntary waiver of Miranda took place where defendant made incriminating statements following an explanation by law enforcement officials of the charges and the evidence against him, after he had invoked his right to counsel); *United States v. Davis*, 527 F.2d 1110 (9th Cir.1975) (defendant's confession, obtained almost immediately after he indicated his desire to remain silent was admissible despite the conduct of FBI agents who asked if defendant wished to reconsider his position and showed the defendant a bank surveillance photograph of himself participating in the robbery).

## II. Use of the Reconstructed Record

 Petitioner contends that the reconstructed portions of the pre-trial record do not adequately address two issues: (i) whether the prosecutor used peremptory challenges to improperly exclude blacks from the jury; and (ii) whether the jury had been tainted by pre-trial publicity. Petitioner claims that, as a result of the inadequacy of the record, he was unable to argue those issues effectively on appeal. Petitioner contends that the state's failure to provide him with a verbatim transcript of the *voir dire* examination is a denial of his due process right to a meaningful appeal.

 It is well established that the absence of a verbatim transcript is not a defect of constitutional magnitude where an adequate alternative is provided:

> Alternative methods of reporting trial proceedings are permissible if they place before the appellate court an equivalent report of the events at trial. A statement of facts agreed to by both sides, a full narrative statement based perhaps on the trial judge's minutes taken during trial or on the court reporter's untranscribed notes, or a bystander's bill of exceptions might all be adequate substitutes, equally as good as a transcript.

*Mayer v. City of Chicago*, 404 U.S. 189, 194, 92 S.Ct. 410, 414–15, 30 L.Ed.2d 372 (1971). "A reconstructed record can accord effective appellate review. This is especially true where the state appellate rules establish a procedure for reconstruction of the trial record." *Morgan v. Massey*, 526 F.2d 347, 348 (5th Cir.1976) In New Jersey reconstruction of the trial record in the state courts is governed by N.J.Ct.R. 2:5–3(e).

The lost or destroyed stenographic tapes from the petitioner's trial included eight days of pretrial motions and in-camera *voir dire* of prospective jurors.[10] Also missing was the October 26, 1977 trial testimony of one of the State's witnesses, a Sergeant James Edwards of the Paterson Police De-

---

10. The eight days were October 11 through 14 and October 17 through 20, 1977.

partment; a December 8, 1977 motion to interview the jurors who had deliberated; and the December 21, 1977 sentencing proceedings.

Hearings to reconstruct the record for the days which stenographic tapes were unavailable were held before two judges [11] who were involved in the trial of petitioner's case. At the reconstruction hearings the State called Bruno Mongiardo, the assistant prosecutor who conducted the trial, and Adolph Galluccio, the designated attorney of the Public Defender's Office who defended the petitioner at the trial. Each judge involved in the trial proceedings filed a statement certifying and settling the record as to those aspects of the trial events held before him in 1977 for which stenographic tapes were unavailable. Those statements, along with all trial notes of the attorneys involved were reviewed, along with the court clerk's minutes of the trial proceedings. Verbatim transcripts of the reconstruction hearings were prepared and made part of the record, along with all exhibits introduced at those hearings.

The appellate court noted that, at the reconstruction hearings, the court took "great pains" in *voir dire* to ensure a proper jury selection process. Furthermore, the appellate court observed that, despite the fact that the petitioner was given ample opportunity to supplement the record of these trial proceedings at the reconstruction hearings, he filed no objections with either judge as to the substance of the reconstructed record.

Ultimately, the appellate court concluded that petitioner's claim must fall because *State v. Gilmore*, 103 N.J. 508, 511 A.2d 1150 (1986), upon which petitioner based his claim, could not be applied retroactively to the petitioner's case. In *Gilmore*, the New Jersey Supreme Court declared that, under the state constitution, a defendant is entitled to a trial by an impartial jury without discrimination on the basis of religious principles, race, color, ancestry, national origin or sex. 103 N.J. at 524, 511 A.2d 1150.

The *Gilmore* Court specifically limited the retroactive effect of its holding.

■ It is a well established principle of federalism that a state decision resting on an adequate foundation of state substantive law is immune from review in the federal courts. *See Wainwright v. Sykes*, 433 U.S. 72, 81, 97 S.Ct. 2497, 2503, 53 L.Ed.2d 594 (1977). The application of this principle in the context of a federal habeas proceeding has therefore excluded from consideration any questions of state substantive law, and thus effectively barred federal habeas review where questions of that sort are either the only ones raised by a petitioner or are in themselves dispositive of his case. *Id.*

The appellate court's conclusion regarding the petitioner's *Gilmore* claim was clearly based upon that court's interpretation of state substantive law. Moreover, it was dispositive of the petitioner's claim. Consequently, it is not reviewable in the petitioner's federal habeas proceeding.

Furthermore, petitioner's contention, that the inadequacy of the record prevented him from establishing on appeal that the jury had been tainted by pre-trial publicity is meritless. Essentially, this is a reformulation of petitioner's argument that his motions for a change of venue and a foreign jury were wrongfully denied by the trial judge. Those contentions are addressed below.

### III. Conduct of the State Shocks the Judicial Conscience

■ Petitioner contends that the state should be estopped from utilizing the reconstructed record because the state's conduct throughout the history of the case shocks the judicial conscience and violates principles of fairness, due process and justice.

The appellate court concluded that the state's actions could not be characterized as obstructionist or antagonistic. The court concluded that the state had every

---

**11.** As noted, the first trial judge had to be hospitalized after the jury was selected. A different judge then conducted the trial and the sentencing proceedings. Separate reconstruction hearings were held before each judge.

right to oppose petitioner's applications for post-conviction relief and habeas corpus relief due to the fact that state remedies had not been exhausted.

Previously, I observed the difficulties which petitioner faced in obtaining appellate review of his conviction. In my earlier opinion I concluded that in many respects, the state's excuses were "untenable" given the fact that petitioner's failure to comply with the appropriate procedural requirements on appeal was attributable to the misguidance (or lack of guidance) he received from his counsel. Indeed, the state's position may have been insupportable, but I do not find that the state acted in an obstructionist or antagonistic manner. Thus, I conclude that petitioner's claim is without merit.

## IV. Delay of Appeal

Petitioner contends that the delay in furnishing the transcripts and the delay in prosecuting his appeal constitutes a denial of due process and his right to a speedy appeal in violation of petitioner's sixth and fourteenth amendment rights.

In my earlier opinion, I observed that the appropriate remedy accorded a defendant who has been denied the right to appeal is to move for an order requiring the state court to make available an appeal *nunc pro tunc*. I further observed that an appeal, at such a late date, may not be feasible because of the difficulties in obtaining the trial transcripts. As discussed above, however, after the issuance of the conditional writ of habeas corpus, the state made diligent efforts to reconstruct the missing portions of the record. I am satisfied that the record furnished by the state was sufficient to give petitioner an effective appeal to the appellate courts. As evidenced by the opinion of the appellate court, petitioner has been accorded a meaningful appeal in the state courts. Consequently, the due process violation alluded to in my earlier opinion has been cured.

## V. Insufficient Evidence

Petitioner's fifth ground is based upon two contentions. First, the petitioner argues that there was a "total dearth of physical, corroborative or direct proof" against him at trial. Second, the petitioner argues that the pre-trial identification procedures employed by the authorities created a substantial risk of misidentification.

The Due Process Clause of the Fourteenth Amendment prohibits the criminal conviction of any person except upon proof beyond a reasonable doubt as to each element of the offense charged. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). However, great deference is paid to decisions reached by the trier-of-fact. When a state court conviction is challenged on the ground of insufficient evidence, habeas corpus relief is appropriate only if the evidence produced at trial, when viewed in the light most favorable to the prosecution, could lead no rational trier-of-fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

There was sufficient evidence produced at petitioner's trial to suggest that the petitioner was guilty of the offenses with which he was charged. After hearing this evidence, the jury determined that the elements of charged offenses had been proven beyond a reasonable doubt, and they returned a guilty verdict on each count. Upon review, it is clear that a rational fact finder could have reached the same conclusion. Therefore, petitioner is not entitled to relief on this claim.

Petitioner also contends that the photograph of him with Wilson and Phillips at police headquarters which appeared in the Saturday May 28, 1977 edition of *The Paterson News* irreparably prejudiced him by creating a substantial likelihood of misidentification by certain witnesses. In addition, petitioner argues that the photographic array shown to those witnesses was substantially misleading.

The Due Process Clause of the Constitution forbids the use of identification procedures which are impermissibly suggestive and give rise to a very substantial likelihood of irreparable misidentification. *See Neil v. Biggers*, 409 U.S. 188,

197, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)). However, since "reliability is the linchpin in determining the admissibility of identification testimony," *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), the suggestiveness of an identification procedure must be evaluated in light of the totality of the circumstances surrounding it." *Id.* at 104, 97 S.Ct. at 2248 (citing *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *see also United States v. Conway,* 415 F.2d 158, 163 (3d Cir.1969), *cert. denied* 397 U.S. 994, 90 S.Ct. 1131, 25 L.Ed.2d 401 (1970)). Facts indicating that an otherwise suggestive identification is highly reliable may render the identification admissible. The Supreme Court has given substance and formal structure to this totality requirement by enumerating five factors to be considered when evaluating an identification procedure:

(1) the opportunity for witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the time of confrontation, and (5) the length of time between the crime and the confrontation.

*Neil v. Biggers,* 409 U.S. at 199–20, 93 S.Ct. at 382.

Application of these criteria to the facts of the instant case reveals that the admission of the identification testimony did not offend traditional constitutional standards. Taken as a whole, the out-of-court identifications possessed sufficient indicia of reliability to merit its inclusion at trial.

Furthermore, petitioner's counsel conceded at trial that the identification procedures utilized by police were not impermissibly suggestive but argued that the pretrial identifications should be precluded under New Jersey Evid.R. 56(1)(b). In his petition for habeas corpus, petitioner argues that, despite exposure to the prejudicial techniques employed by the police, no witness could positively identify the petitioner at trial. Petitioner advances this argument in support of his contention that the procedures employed by the police created a substantial likelihood of misidentification. The events of trial, however, belie the petitioner's argument, Indeed, the fact that no witness (who was exposed to the newspaper photo or the photo array) was able to positively identify the petitioner at trial leads to the inexorable conclusion that the techniques employed during pre-trial identification *did not* lead to a misidentification at trial. As a result, this claim for habeas relief must fail.

## VI. Fair and Impartial Jury

After the verdict was rendered, the petitioner moved for an order permitting examination of the 12 deliberating jurors regarding the verdict. Petitioner argued that there was evidence to indicate that jury was biased and that the verdict was against the weight of the evidence. The trial judge denied the motion.

The trial judge is vested with broad discretion when evaluating alleged juror misconduct and bias. *U.S. v. Coven,* 662 F.2d 162, 175 (2d Cir.1981) *cert. denied,* 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 176 (1981). The reason for such discretion is that the trial judge observes the jury on a day to day basis, and is in the best position to assess prejudice arising out of premature jury discussions. *United States v. Clapps,* 732 F.2d 1148, 1152 (3d Cir.1984), *cert. denied* 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984). The Third Circuit in *Government of the Virgin Islands v. Gereau,* 523 F.2d 140 (3d Cir.1975) *cert. denied,* 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976) established that normal jury pressures and/or influences do not warrant overturning the verdict. *Id.* at 151. Specifically, it enumerated violations which would in fact rise to the level of a Sixth Amendment violation:

(a) exposure of jury to news items "about the matter pending before the jury;"

(b) consideration by the jury of facts not on the record;

(c) communications between third parties and jurors which are relevant to the pending case.

*Id.* at 150.

In the case at bar, petitioner points to letters written by one juror to defense counsel and the prosecutor after the completion of the case. After reviewing the letters in question, I conclude that none of the concerns raised by the Third Circuit in the *Gereau* case are implicated in this case. Consequently, petitioner's claim must is without merit.

## VI. Jury Instructions

■ Petitioner contends that the trial judge erred in charging the jury by not giving more thorough instructions on identification, by improperly instructing the jury with respect to Wilson's immunity and by improperly instructing the jury that petitioner had, at age 16, been tried as an adult.

■ Questions pertaining to jury instructions are normally matters of state law and are not cognizable in federal habeas corpus review. *Grecco v. O'Lone,* 661 F.Supp. 408, 412 (D.N.J.1987) (citations omitted). "Only where the giving of an instruction is so prejudicial as to amount to a violation of due process and fundamental fairness will a habeas corpus claim lie." *Grecco,* 661 F.Supp. at 412. *See also* 28 U.S.C. § 2254(a).

In the instant case, I conclude that the instructions given by the trial judge comported with due process and fundamental fairness. As observed by the appellate court, the trial judge expressly advised the jury that no in-court identification had occurred and stressed the tentative nature of each witness' out-of-court identifications. Moreover, the judge properly instructed the jury that Wilson's immunity only applied to the use of his own testimony against him. Finally, while instructing the jury, the trial judge correctly stated that the petitioner's prior convictions could only be used to impeach his credibility and could

not be considered as evidence of guilt. As noted by the appellate court, these instructions were consistent with state law. Accordingly, petitioner's claim is without merit.

## VII. Trial Error

Petitioner contends that the trial judge committed numerous errors during the course of the trial. He contends that the cumulative effect of these errors is tantamount to a violation of his constitutional rights under the Fifth, Sixth and Fourteenth Amendments.

■ For an alleged error to constitute a due process violation, petitioner must prove that the error made his trial so fundamentally unfair that he was denied due process or some other specific constitutional right. *Cramer v. Fahner,* 683 F.2d 1376, 1381 (7th Cir.1982).

Petitioner contends that the trial judge erred by precluding defense counsel from eliciting the names of individuals named in an anonymous telephone call to the Paterson police.[12] At trial, however, defense counsel indicated that he had no interest in ascertaining the names of the individuals allegedly involved in the crimes. Thus, as observed by the appellate court, petitioner's grievance is rooted in his dissatisfaction with the strategy of defense counsel. Moreover, petitioner has not shown that the exclusion of these names rose to the level of a constitutional violation. Thus, his claim is without merit.

Petitioner argues that the aggregate effect of other trial errors denied him his right to a fair trial: (i) improper jury instructions; (ii) admission of hearsay testimony by Wilson and Phillips that they knew the petitioner; (iii) admission of expert testimony by a forensic expert who stated that the lead pipe contributed to the death of Dr. Doktor and expert testimony of Dr. Van Vooren regarding the death of Dr. Doktor; (iv) admission of petitioner's newspaper photograph; (v) the denial of

---

12. On June 8, 1977 the Paterson police received an anonymous phone call. The caller stated that two of the men arrested were "right" and

named two other men who were allegedly involved in the murder/mugging of Dr. Doktor and Mr. Marshall.

petitioner's motions for discovery and a mistrial; (vi) admission of testimony of police officer who apprehended petitioner; and (vii) granting the state's motion to consolidate the indictments.[13]

The appellate court concluded that; "any errors that existed were harmless beyond a reasonable doubt." I concur with the findings of the state court. None of the alleged errors, either singularly or cumulatively, infected the entire trial so that the resulting conviction was violative of due process or fundamental fairness.

### IX. Recantation Testimony

Petitioner also argues that the trial judge erroneously denied his 1989 post-conviction motion for a new trial based upon the recantation testimony of Wilson.

■ Great deference is afforded to the trial court in the determination of whether recantation testimony is credible. *See Government of Virgin Islands v. Lima,* 774 F.2d 1245, 1251 (3d Cir.1985) (quoting *United States v. Johnson,* 327 U.S. 106, 111–12, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1946)); *see also State v. Carter,* 69 N.J. 420, 427 (1967) ("The determination of the credibility or lack thereof of recantation testimony is peculiarly the function of the trial judge who sees the witnesses, hears their testimony and has a feel of the case.") Furthermore, courts have noted that "recantation of testimony given at trial are 'looked upon with the utmost suspicion.'" *United States ex re. Rice v. Vincent,* 491 F.2d 1326, 1332 (2d Cir.1974); *United States v. Mackin,* 561 F.2d 958, 961 (D.C.Cir.1977) *cert. denied* 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977).

In the instant case, there is no reason to doubt the trial judge's determination that Wilson's recantation was not credible. His findings were supported by the record and were consistent with the state law standards applicable to the petitioner's motion for a new trial.

### X. Excessive Sentence

■ Finally, petitioner contends that his sentence is manifestly excessive and that the trial judge erred in failing to merge the convictions and in imposing a consecutive sentence.

■ Sentencing is a matter of state criminal procedure and so long as the sentence imposed falls within the statutory bounds, it does not implicate federal constitutional issues. *Jones v. Superintendent, Rahway State Prison,* 725 F.2d 40, 42–43 (3d Cir.1984).

The petitioner's sentence was within the statutory guidelines. Moreover, the decision not to merge the convictions was within the scope of the trial court's discretion. Consequently, petitioner has not raised an issue of constitutional magnitude. His claim, therefore, must fail.

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is hereby dismissed without the issuance of a certificate of probable cause and without an evidentiary hearing.

---

**13.** The state moved to consolidate the indictment for the murder of Dr. Doktor and conspir-

acy to commit robbery of Dr. Doktor with the indictment for the robbery of George Marshall.